UNITED STATES of America, Appellee,

v.

Bertram E. SEIDLITZ, Appellant.

No. 76–2027.

United States Court of Appeals,
Fourth Circuit.

Argued July 19, 1978.

Decided Dec. 5, 1978.

David M. Dorsen, Washington, D. C. (Sachs, Greenebaum & Tayler, Washington, D. C., Beverly Sherman Nash, Washington, D. C., Sachs & Greenebaum, Chevy Chase, Md., on brief), for appellant.

Robert A. Rohrbaugh, Asst. U. S. Atty., Baltimore, Md. (Russell T. Baker, Jr., U. S. Atty., Baltimore, Md., on brief), for appellee.

Before WINTER, Circuit Judge, FIELD, Senior Circuit Judge, and HALL, Circuit Judge.

FIELD, Senior Circuit Judge:

Bertram Seidlitz appeals from his conviction on two counts of fraud by wire in violation of 18 U.S.C. § 1343.[1] As grounds for reversal, he urges that the trial court erred in its denial of a pretrial motion to suppress evidence, and that the prosecution failed to establish certain material elements of the crime. Although advanced in a somewhat novel factual context, we find appellant's contentions to be without merit.

On January 1, 1975, defendant Seidlitz assumed the position of Deputy Project Director for Optimum Systems, Inc. (OSI), a computer service company which was under contract to install, maintain, and operate a computer facility at Rockville, Maryland, for use by the Federal Energy Administration (FEA). Under the arrangement between OSI and FEA, persons working for FEA in various parts of the country could use key boards at communications terminals in their offices to send instructions over telephone circuits to the large computers in Rockville, and the computers' responses would be returned and reflected on a CRT (cathode ray tube) terminal which is a typewriter-like device with a keyboard and display screen similar to a television screen upon which the information is displayed as it is sent and received.[2] Mr. Seidlitz helped

---

1. The federal wire fraud statute, 18 U.S.C. § 1343, provides:

   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

2. A remote user would dial on an ordinary telephone one of the several unpublished telephone numbers to which OSI subscribed and which were assigned to the computers. He would then connect the telephone to his terminal so that messages could be relayed between the terminal and the computers in the form of signals traveling over the telephone line. Because any of a number of commercially available terminal units could accomplish such a link to the computers, the user, as a security precaution, had to enter on his terminal keyboard a special access code before he would be permitted full use of the system. The code con-

to prepare the software [3] which was installed at the Rockville facility as part of the project, and he was also responsible for the security of the central computer system. During his tenure, he had full access to the computers and to a software system known as "WYLBUR" which resided within them.[4] In June, 1975, Seidlitz resigned this job and returned to work at his own computer firm in Alexandria, Virginia.

William Coakley, a computer specialist employed by FEA, was assigned temporarily to the OSI facility. On December 30, 1975, in an attempt to locate a friend who might be using the OSI system, he had the computer display the initials of everyone who was then using the WYLBUR software. Among the initials displayed by the computer were those of his supervisor, who was standing nearby and who was not using the computer. Suspicious that an unauthorized "intruder" might be using these initials in order to gain access to the system,[5] Coakley asked Mr. Ewing, an OSI employee, if Ewing could determine what was happening. He also asked Mr. Wack, an OSI supervisor, if he (Wack) could determine whether the mysterious user was at a remote terminal or at one of the terminals within the OSI complex which were directly wired to the computer and did not employ telephone circuits. Ewing instructed the computer to display for him the data it was about to transmit to the possible intruder, and it proved to be a portion of the "source

code" of the WYLBUR software system.[6] Using other data provided by the computer, Wack concluded that the connection was by telephone from outside the complex. At his request, the telephone company manually traced the call to the Alexandria office of the defendant.[7] Wack was told that the trace was successful, but the telephone company informed him that it could not divulge the results of the trace except in response to a legal subpoena.

The following day, OSI activated a special feature of the WYLBUR system known as the "Milten Spy Function," which automatically recorded, after they had been received by the machinery at Rockville, any requests made of the computer by the intruder. The "spy" also recorded, before they were sent out to the intruder over the telephone lines, the computer's responses to such requests. Mr. Wack again asked the telephone company to trace the line when it was suspected that the unauthorized person, employing the same initials, was using the computer to receive portions of the WYLBUR source code. This manual trace on December 31 led once more to the defendant's office in Virginia, although OSI was not so informed.

Advised by OSI of the events of December 30 and 31, the FBI on January 3, 1976, secured, but did not then execute, a warrant to search the defendant's Alexandria office.[8] At the FBI's suggestion, the tele-

tained, among other things, the user's personal initials, which were to be invalidated when he left OSI or FEA. This "access code" would be communicated to the central computers which, if they recognized the code as belonging to an authorized user, would proceed to perform the work the individual sent along.

3. To be distinguished from "hardware", which is the tangible machinery of the computer, "softwear" refers to the logic and directions loaded into the machine that cause it to do certain things on command.

4. The WYLBUR software system facilitated the computers' exchanges with FEA users at the remote terminals. It contained no classified FEA information, but rather enabled the computers to perform tasks assigned to them by FEA personnel. An OSI manual described WYLBUR as "an online interactive text editor

designed to facilitate the creation of text and to provide a powerful and comfortable tool for changing, correcting, searching and displaying text."

5. See n. 2, supra.

6. A source code is a programming language, understandable to humans, in which a computer is given instructions.

7. A manual trace is accomplished without listening in on the line or breaking into the conversation. It entails a physical tracing of the telephone circuitry backward through the various switching points from the equipment which receives the call.

8. The affidavit in support of the application for the warrant related that the intrusions had

phone company conducted two additional manual traces when alerted to incoming calls by OSI, but in each instance the calls were terminated before the traces had progressed beyond the telephone company's office in Lanham, Maryland, which served 10,000 subscribers. The phone company then installed "originating accounting identification equipment" in the Lanham office, the function of which was to automatically and quickly ascertain, without intercepting the contents of any communication, the telephone number of any of the 10,000 area telephones from which any subsequent calls to the OSI computers originated. Two such calls were made on the morning of January 9, and the equipment attributed both of them to a phone at the defendant's Lanham residence. That afternoon, the FBI executed the warrant to search Seidlitz' Alexandria office, seizing, among other items, a copy of the user's guide to the OSI system and some 40 rolls of computer paper upon which were printed the WYLBUR source code.[9] A warrant was then issued to search the Seidlitz residence in Lanham,[10] where officers found a portable communications terminal which contained a teleprinter for receiving written messages from the computer, as well as a notebook containing information relating to access codes [11] previously assigned to authorized users of the OSI computers.

The indictment handed down on February 3, 1976, charged that the defendant had, on December 30 and 31, transmitted telephone calls in interstate commerce as part of a scheme to defraud OSI of property consisting of information from the computer system.[12] A motion to suppress the evidence seized from the office and the residence was considered at a hearing on April 30,[13] after which the district judge rendered an oral opinion rejecting the defendant's argument that the searches were invalidated by the use of illegal electronic surveillance to obtain the information contained in the affidavits supporting the warrants. Specifically, the district judge ruled that (1) as to the information obtained by use of the "spy", Section 605 of the Communications Act of 1934, 47 U.S.C. § 605, does not apply, and neither Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510, et seq., nor the Fourth Amendment were violated, since the information was obtained with the consent of a party to the defendant's telephonic communications, and (2) with respect to the tracing of the telephone calls, neither Title III nor the Fourth Amendment are offended when, as in the "pen register" cases, the number of the telephone from which a call is placed is determined by a process which does not entail the interception of the contents of the communication. Over defense objection, much of the challenged evidence was admitted at trial, and the telephone traces, as well as the operation of the "Milten Spy", were described to the jury. In the face of this evidence, the defendant conceded that he had retrieved the informa-

been detected, that OSI had "furnished written release" to receive information regarding the telephone traces of December 30 and 31, and that the telephone company had disclosed to the FBI that the calls originated from the defendant's office. It also stated that, as a result of an investigation of former OSI employees and interviews with OSI personnel, the FBI, prior to the receipt of the trace information, had ascertained Seidlitz' business address and concluded that he was the chief suspect.

9. The information on these printouts was identified at trial as being identical to the information recorded by the "spy" program on December 31.

10. The affidavit in support of the application for this warrant in essence contained the same statements made in the application for the pri-

or warrant. See n. 8, supra. In addition, it related that the FBI had been informed that Seidlitz maintained a communications terminal at his home, that the search of the office had not uncovered the terminal, and that the telephone company's trace of the calls that morning indicated that they were made from the defendant's residence.

11. See n. 2, supra.

12. A motion for acquittal on a third count of interstate transportation of stolen property was granted during the course of the trial.

13. The evidence presented at the suppression hearing established all the facts which we have summarized above.

tion from the computers, but claimed to have acted only out of concern for the security of the OSI system. In negation of fraudulent intent, Seidlitz testified that he acquired the data with the sole intention of presenting the printouts to OSI officials to prove to them that the steps taken to prevent unauthorized use of the computers were inadequate. Additionally, it was his position at trial that the WYLBUR software was not a trade secret or other property interest of OSI sufficient to qualify as "property" within the meaning of the wire fraud statute. On appeal he renews the "illegal surveillance" claims and also argues that the evidence before the jury was insufficient to establish either his fraudulent intent or that WYLBUR constituted "property."

█ In considering the surveillance questions, we assume that if, as the defendant contends, either the "spy" activities or the traces were conducted illegally, then the evidence seized at both the office and the residence should have been suppressed, since the affidavits upon which the warrants were issued contained information attributable to the "spy" and the telephone traces which was essential to the finding of probable cause to search.[14] Furthermore, if the statutory or constitutional standards upon which the defendant relies were transgressed, then the jury should not have been informed of the deployment of the "spy" and the traces of the telephone calls.[15]

█ It can safely be said, however, that even if, as the defendant argues, the Milten Spy or the telephone traces resulted in the "interception" of his communications with the computers, these communications were wire or telephone communications since in each instance the defendant was exchanging messages with the computers over commercial telephone circuits.[16] For this reason the district court correctly concluded that Section 605 of the Communications Act of 1934, 47 U.S.C. § 605, could have no bearing whatever upon the legality of these activities. While at one time Section 605 did contain standards for determining the legality of the interception of telephone conversations, the statute was amended by Section 803 of Pub.L. 90–351, 82 Stat. 223, in 1968, for the express purpose of excluding from its scope the interception of wire communications and of transferring the regulation of such activity to certain provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968. *See United States v. Clegg,* 509 F.2d 605, 611–612 (5 Cir. 1975); *United States v. Falcone,* 505 F.2d 478, 482 (3 Cir. 1974), *cert. denied* 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975); S.Rep.No.1097, 90th Cong., 2d Sess. 107 (1968), *reprinted in* [1968] U.S.Code Cong. & Admin.News, pp. 2112, 2196. Today Section 605 pertains to the interception of only radio communications, and there is no indication that radio communications of any kind were involved in the apprehension and conviction of the defendant. The appropriate inquiry, then, is whether any of the questioned activities amounted to the kind of interceptions of wire communications condemned by Title III.

█ The language, the legislative history, and the Supreme Court's interpretation of the relevant provisions of Title III support the district court's conclusion that the telephone traces in this case were not the sort of "interceptions" of communications

---

**14.** In ruling on the motion to suppress, the district court also made this assumption. "[T]he question is whether the information * * * was legally or illegally secured. If, of course, it was illegal, then the searches must fail * * *". Appendix, p. 133.

**15.** Section 605 of the Communications Act has been interpreted to require the exclusion of evidence obtained in violation thereof, *Nardone v. United States,* 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937), and an express exclusionary rule is contained in Title III of the Omnibus Act

at 18 U.S.C. § 2515. A judicially-fashioned rule of exclusion applies where surveillance does not comport with Fourth Amendment requirements. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

**16.** The same can be said of Mr. Ewing's inquiry of the computer on December 30 by which he ascertained, as did the Milten Spy on the following day, that the intruder was receiving part of the WYLBUR source code.

proscribed by the statute. "Intercept" is defined in 18 U.S.C. § 2510(4) to mean "the aural acquisition of the *contents* of any wire or oral communication through the use of any electronic, mechanical, or other device" (emphasis added); "'contents' * * includes any information concerning the identity of the parties to [the] communication or the existence, substance, purport, or meaning of [the] communication." 18 U.S.C. § 2510(8). The evidence adduced at the suppression hearing conclusively shows that neither the manual traces conducted on December 30 and 31, nor the traces which were achieved by use of the special equipment later installed, entailed interference with or observation of the contents of the defendant's dialogues with the computers. That Congress intended to exempt such procedures from the coverage of the statute is borne out by the Senate Report which accompanied the legislation, and explained that

> "[t]he proposed legislation is not designed to prevent the tracing of phone calls * *. The proposed legislation is intended to protect the privacy of the communication itself and not the means of communication."

S.Rep.No.1097, *supra,* at 90; U.S.Code Cong. & Admin.News, *supra,* at 2178. *See Michigan Bell Tel. Co. v. United States,* 565 F.2d 385, 387–389 (6 Cir. 1977). Especially in view of *United States v. New York Telephone Co.,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977), which held that "pen registers" (which similarly "overhear" none of the substance of a telephone communication, 434 U.S. at 161, n. 1, 98 S.Ct. at 364, n. 1) do not run afoul of the statute, we perceive no reason to invalidate the telephone traces on statutory grounds.

▮ We also concur in the disposition by the court below of the challenge under Title III to the information obtained through the use of the Milten Spy. First, the statute proscribes only the "aural" acquisition of the contents of wire communications, 18 U.S.C. § 2510(4), *supra,* and there is no evidence to suggest that the "spy" relied in any fashion upon sounds in retrieving information from the computers in written form. *Cf. United States v. New York Telephone Co., supra,* 434 U.S. at 166–167, 98 S.Ct. 364. We find no merit in the defendant's suggestion that, in the absence of either a statutory definition of the word "aural" or of legislative history to indicate that Congress even considered the relationship of Title III to computer systems, we should ignore the plain meaning of the term "aural"[17] and should hold that, regardless of whether a device detects sound, its ability to interpret the substance of a transmission brings it within the restrictions of the statute. Canons of statutory construction require that we attribute to legislatively undefined words their commonly accepted meaning and that we give effect to what must be presumed to have been the purposeful inclusion in the legislation of a qualifying term such as "aural" which restricts the statute's scope.[18] Second, to the extent that the Milten Spy disclosed, *before* they were sent out over the telephone lines, the substance of the replies generated by the computer to the intruder's commands, the information was not a "wire communication" at the time of its retrieval, and its disclosure thus did not violate the statute. Under Title III, a "wire communication" is a communication made "in whole or in part" through the facilities of a common carrier, 18 U.S.C. § 2510(1), and the portion of the WYLBUR source code requested by Seidlitz was obtained by the "spy" before it had travelled through such facilities. While arguably this reasoning might not apply to

---

17. "The words 'aural acquisition' literally translated mean to come into possession through the sense of hearing (Webster's Third New International Dictionary, 1967 Ed.)." *Smith v. Wunker,* 356 F.Supp. 44, 46 (S.D.Ohio 1972).

18. *See Platt v. Union Pacific R.R. Co.,* 99 U.S. 48, 58–59, 25 L.Ed. 424 (1878); *State Water Control Board v. Train,* 559 F.2d 921, 924 n. 20 (4 Cir. 1977). These rules are applicable here because the legislative history indicates neither what Congress meant by "aural" nor why the word was written into the statute.

the spy's duplication, after they had been received by the computer, of any of the instructions Seidlitz sent by telephone, it unquestionably legitimizes under the statute that portion of the retrievals which identified the outgoing information as the WYLBUR source code. Finally, Title III specifically authorizes the interception of a wire communication by a party to the communication or by a person acting with the consent of a party to the communication. 18 U.S.C. § 2511(2)(c), (d). In our opinion OSI, which leased, housed, programmed, and maintained the computers and subscribed to the relevant telephone numbers, was for all intents and purposes a party to the communications initiated by the defendant, since in a very real sense the company used the computers solely as a medium for imparting to customers, via telephone lines, its own expertise. Insofar as OSI installed on its line a computer which was capable of recording the messages exchanged in the course of responding to a remote user's requests, we consider this case analogous to those which recognize that a party may, consistent with Title III, use a device to capture and record both sides of his telephone conversation with another party. *See, e. g., United States v. Turk,* 526 F.2d 654 (5 Cir. 1976), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976); *Smith v. Cincinnati Post & Times-Star,* 475 F.2d 740 (6 Cir. 1973); *Smith v. Wunker,* 356 F.Supp. 44 (S.D.Ohio 1972). *Cf. United States v. Bragan,* 499 F.2d 1376 (4 Cir. 1974).[19]

The last of the objections raised in the court below to the evidence secured by the Milten Spy and the telephone traces was that it was detected and obtained in contravention of the Fourth Amendment. The district judge rejected this contention on the ground that even though the "spy" and the traces were utilized without prior judicial authorization, the evidence was obtained by searches to which the appropriate persons had consented. We need not review the soundness of that ruling or the implicit conclusion that the "spy" and the traces raised questions under the Fourth Amendment,[20] since in our opinion the activities complained of were, at most, conducted by private persons—OSI and the telephone company—to which the constitutional prohibition against warrantless searches does not apply. "[I]t is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals," and consequently the Fourth Amendment and the exclusionary rule by which it is enforced come into play only where it appears from all of the circumstances that in a particular case the challenged evidence was obtained as a result of a search conducted by government officers or by private persons acting as agents or instrumentalities of the

---

**19.** The three reasons set forth in this paragraph also apply to Mr. Ewing's actions of December 30. *See* n. 16, *supra.*

**20.** Interceptions of two-party conversations were discussed in the context of the Fourth Amendment in the cases cited by the district court to support its conclusion. In each instance, government law enforcement officers had arranged and actively participated in the challenged surveillance. *See United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); *United States v. Bernstein,* 509 F.2d 996 (4 Cir. 1975); *United States v. Dowdy,* 479 F.2d 213 (4 Cir. 1973). *White* and *Dowdy* do support the view that the voluntary participation in such surveillance by one of the parties to a telephone call will satisfy the Fourth Amendment, and as already indicated, we tend to agree that even if Seidlitz' data transmissions were made with a legitimate expectation of privacy (a question we do not decide and about which we have serious reservations), the fact that OSI voluntarily recorded them obviates Fourth Amendment concerns as to the "spy". But we are not sure that a similar approach is valid with respect to the traces of the telephone numbers, and the parties have not briefed this aspect of the constitutional issue. Rather than decide either the "open" question of whether the Fourth Amendment applies to such traces, *see United States v. New York Tel. Co., supra,* 434 U.S. at 165, n. 7, 98 S.Ct. 364, n. 7, or the more perplexing question of whether the recipient of a call can, under the Fourth Amendment, consent to a warrantless trace of the caller's telephone, we choose to rest our opinion as to the constitutionality of the "spy" and the traces on the ground set forth in the text.

government. *Coolidge v. New Hampshire,* 403 U.S. 443, 487–490, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). *See also Burdeau v. McDowell,* 256 U.S. 465, 475–476, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *United States v. Mekjian,* 505 F.2d 1320 (5 Cir. 1975); *United States v. Pryba,* 163 U.S.App.D.C. 389, 502 F.2d 391 (1974), *cert. denied,* 419 U.S. 1127, 95 S.Ct. 815, 42 L.Ed.2d 828 (1975); *Corngold v. United States,* 367 F.2d 1 (9 Cir. 1966) (*en banc*). *Cf. United States v. Crabtree,* 545 F.2d 884 (4 Cir. 1976). Emphasizing that FEA's Mr. Coakley, upon discovering the suspicious initials, asked OSI's Ewing "if there was some way that he could determine what this account was doing," [21] and that he asked OSI's Wack "if he could determine where the call was coming from," [22] the defendant would have us find that the subsequent determination by OSI that the intruder was receiving the WYLBUR source code, as well as the telephone company's identification of the originating phone numbers, were actions for which the government should be held accountable and to which the Fourth Amendment applies. In our opinion, however, these nonspecific, innocuous remarks by a civilian employee of the FEA were in stark contrast to the active involvement by a Secret Service agent which tainted the search in *Lustig v. United States,* 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949), cited by the defendant,[23] and they do not amount to the kind of conduct on the part of the government which has been held sufficient to deprive a citizen's search of its private character.[24] Under the criteria uniformly considered by the courts in assessing the degree of federal involvement in an otherwise private search for purposes of the Fourth Amendment, the instant "searches" and their fruits are not subject to scrutiny under the exclusionary rule.[25]

While we base our affirmance of the denial of the suppression motion upon our consideration of the statutory and constitutional arguments advanced by the appellant, and addressed by the court below, we think it appropriate to observe that we discern a certain speciousness which infects all of the illegal surveillance contentions made by the defendant with respect to the evidence which was obtained through use of the Milten Spy. Unlike the typical telephone user who employs the telephone merely as a convenience to converse with other persons over distances, Seidlitz used the telephone to tamper with and manipulate a machine which was owned by others, located on their premises, and obviously not intended for his use. Unlike the party to a

21. Appendix, p. 41.

22. Appendix, p. 42.

23. *Lustig* presented the related question of whether, under the now defunct "silver platter" doctrine, a federal officer was so involved in an illegal search by city police as to require the suppression in a federal prosecution of the evidence uncovered by the search. The facts reveal that a federal Secret Service agent, who was charged with enforcing the counterfeiting laws, joined the unlawful search of a hotel room by city police after it had already begun. While there, he sifted through the items uncovered by the local officers (who were aware of his interest in the case), selecting those articles which were later used as evidence in a federal counterfeiting prosecution of one of the occupants of the room. The Court found that the agent "had an active hand" in the search, and held that the trial court should have suppressed the evidence obtained by him.

24. *See* the cases collected in *Annot.,* 36 A.L. R.3d 553 (1971).

25. The test most frequently employed is borrowed from the *Lustig* case, *supra,* 338 U.S. at 79, 69 S.Ct. at 1374, which recognized that "the decisive factor * * * is the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means." *See also, United States v. Sherwin,* 539 F.2d 1, 7–8 (9 Cir. 1976); *United States v. Entringer,* 532 F.2d 634, 637 (8 Cir. 1976), *cert. denied,* 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976); *United States v. Clegg,* 509 F.2d 605, 609–611 (5 Cir. 1975); *United States v. Cangiano,* 464 F.2d 320, 324–325 (2 Cir. 1972), *vacated and remanded on other grounds,* 413 U.S. 913, 93 S.Ct. 3047, 37 L.Ed.2d 1023 (1973), *on remand,* 491 F.2d 905 (1973), *cert. denied,* 418 U.S. 934, 94 S.Ct. 3223, 41 L.Ed.2d 1171 (1973); *United States v. Johnson,* 451 F.2d 1321, 1322 (4 Cir. 1971), *cert. denied,* 405 U.S. 1018, 92 S.Ct. 1298, 31 L.Ed.2d 480 (1972).

personal telephone call who may have little reason to suspect that his words are being covertly recorded, Seidlitz, a computer expert, undoubtedly was aware that by their very nature the computers would record the data he sent and received, and that OSI, also expert in the use of computers, could detect such exchanges if alerted to the presence of an intruder. In this sense the use by the witnesses below of the term "intruder" to describe an unauthorized user of the computers is aptly applied to the defendant, since by telephonic signal he in fact intruded or trespassed upon the physical property of OSI as effectively as if he had broken into the Rockville facility and instructed the computers from one of the terminals directly wired to the machines. Under these circumstances, having been "caught with his hand in the cookie jar", we seriously doubt that he is entitled to raise either statutory or constitutional objections to the evidence.

■ We have carefully reviewed the other issues raised by the appellant and find them to be without merit. Viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), there was sufficient evidence from which the jury could find that the WYLBUR system was "property" as defined in the instruction given by the trial judge which is not contested on appeal. Even though software systems similar to OSI's WYLBUR were in use at non-OSI facilities, the evidence that OSI invested substantial sums to modify the system to suit its peculiar needs, that OSI enjoyed a multi-million dollar competitive advantage because of WYLBUR, and that OSI took steps to prevent persons other than clients and employees from using the system permitted a finding that the pilfered data was the property of OSI and not, as the defendant contends, property in the public domain subject to appropriation by persons such as himself. In a similar vein, the defendant disputes the sufficiency of the evidence to establish fraudulent intent,

but in essence his argument is only that he feels the jury should not have discredited his own explanation of the purpose for which he acquired the WYLBUR data. It is of no consequence that Seidlitz was not shown by the government to have used the data retrieved from the OSI computers in his own business or to have attempted to sell it to others, *see United States v. Painter,* 314 F.2d 939 (4 Cir. 1963), *cert. denied,* 374 U.S. 831, 83 S.Ct. 1873, 10 L.Ed.2d 1054 (1963); *United States v. Bagdasian,* 291 F.2d 163 (4 Cir. 1961), *cert. denied,* 368 U.S. 834, 82 S.Ct. 60, 7 L.Ed.2d 36 (1961), and the circumstantial evidence in this case is ample to support a finding of the requisite intent.

■ On appeal, the defendant raises other objections relative to the searches of his office and residence, but these points were neither fairly raised in the motion to suppress evidence nor urged upon the trial court at the suppression hearing. Absent plain or fundamental error, we need not consider on appeal legal points which were available to the appellant but not presented for the district court's consideration. *United States v. Braunig,* 553 F.2d 777, 780 (2 Cir. 1977), *cert. denied,* 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 277 (1977); *United States v. Rollins,* 522 F.2d 160, 165–166 (2 Cir. 1975), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976); *United States v. Anderson,* 481 F.2d 685, 694–695 (4 Cir. 1973), *aff'd,* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974). *See* Rules 12(f) and 52, Federal Rules of Criminal Procedure.

*AFFIRMED.*