**UNITED STATES of America, Plaintiff,**

v.

**Werner Ernst GREGG and Roswitha L. Gregg, Defendants.**

No. 85–0039–01/02–CR–W–8.

United States District Court,
W.D. Missouri, W.D.

Feb. 15, 1986.

John R. Osgood, Asst. U.S. Atty., Kansas City, Mo., for plaintiff.

James R. Hobbs and Thomas V. Bender of Linde, Thomson, Fairchild, Langworthy, Kohn & Van Dyke, P.C., Kansas City, Mo., for defendant, Werner Gregg.

James R. Wyrsch and Charles E. Atwell of Koenigsdorf, Kusnetzky & Wyrsch, Kansas City, Mo., for defendant, Roswitha L. Gregg.

## ORDER

STEVENS, District Judge.

Defendants are married and are the proprietors of Gregg International, an export/import business in Raytown, Missouri. They are charged with violations of various customs statutes and Internal Revenue Code provisions. Defendants jointly seek to suppress evidence obtained by: (1) "trash searches" of defendants' business and residence, (2) court-authorized interceptions of telex communications, (3) checkpoint seizures by customs agents, (4) statements of defendant Werner Gregg taken pursuant to a customs search and detention, (5) searches of defendants' business and residence pursuant to search warrants, and (6) statements of defendant Roswitha Gregg. On June 3–6, 1985, the court held an evidentiary hearing, and shortly after the hearing the court published written notice of its intention to deny defendants' joint suppression motion in all respects, with a written opinion to follow. The following is a written memorandum of the court's decision.

*Trash Searches*

In February, 1984, United States customs agents reached an agreement with representatives of a trash collection company for the company to give the agents any trash collected from defendants' residence and place of business. Evidence seized from the trash was used in support of the affidavits submitted for court-authorized seizure of defendants' telex communications. Subsequent searches of the Greggs' residence and business, customs searches, and statements taken from the defendants all resulted from the initial trash and telex searches. Defendants allege that beginning with the trash searches, all evidence seized from defendants was seized illegally, and each subsequent seizure resulted from precedent illegal seizures. Therefore, defendants contend, all evidence seized from defendants and any evidence derived therefrom must be suppressed.

The following facts regarding the trash searches were revealed at the evidentiary hearing in this matter. Defendants made arrangements for a private trash hauling company to pick up trash at defendants' residence and place of business [1] on a regular schedule. In February, 1984, Agent Ronald Garrison of the United States Customs Service informally approached a truck driver for the private company and reached an agreement whereby the driver would turn defendants' business and residence trash over to customs agents for $20.00 each time the trash was collected. The agents first would verify that defendants had placed trash out for collection. A customs agent would meet the trash hauler and give him bags for the defendants' residence or business trash, the trash hauler

---

1. Defendants' residence and business are both located in Raytown, Missouri. Defendants used the services of two private hauling companies during the relevant time period; customs agents reached the same agreement with both companies to obtain defendants' trash.

would pick up defendants' trash, place it in the agent's bags, and then turn the trash over to the agent at a point near defendants' business or residence.

The trash at defendants' residence normally was left for collection in a plastic bag within a plastic receptacle left at the curbside of defendants' residence. The trash at defendants' business normally was left for collection in a plastic bag within a plastic receptacle located outside and adjacent to the back door of the business, approximately twenty-five to thirty-five feet from the street. The customs agents did not at any time contact the owners of the private trash companies; they relied on an informal agreement with the trash haulers. No search warrant was ever obtained for a trash search. Agents seized and searched defendants' residence and business trash on a regular basis from February 7, 1984 until September 11, 1984.

■ The court finds that defendants did not have a legitimate expectation of privacy in the trash picked up from their residence and business, and there was no fourth amendment violation in the seizure and search of their trash. In *United States v. Michaels*, 726 F.2d 1307 (8th Cir.), *cert. denied*, ── U.S. ──, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984), the court of appeals stated:

> Those circuits that have considered the issue of whether a person has a legitimate expectation of privacy in trash placed for collection in a public area, in close proximity to a public way, or in an outdoors communal trash container serving an apartment building, have consistently denied fourth amendment relief.

*Id.* at 1312 (citations omitted).

Furthermore, in *United States v. Biondich*, 652 F.2d 743 (8th Cir.), *cert. denied*, 454 U.S. 975, 102 S.Ct. 527, 70 L.Ed.2d 395 (1981), the court of appeals held:

> A person ordinarily retains some expectation of privacy in items that remain on his or her property, regardless of whether they are placed in an automobile, a home, or a garbage can. When a person makes arrangements with a sanitation service to have the items picked up, how-

ever, and when the items are placed in the designated place for collection and the regular collector makes the pickup in the usual manner on the scheduled collection day, the person loses his or her legitimate expectation of privacy in the items at the time they are taken off his or her premises.

*Id.* at 745.

The instant facts fall squarely within the *Biondich* rationale. Defendants made arrangements for a private company to pick up their business and residence trash in a regularly designated place at a regularly scheduled time. Evidence produced at the evidentiary hearing showed that the trash haulers picked up defendants' trash on a regular schedule, transported it away from defendants' business or residence, and the customs agents then received the trash at a point removed from defendants' property. Defendants lost any legitimate expectation of privacy in the trash at the time it was removed from their residence or business premises.

Defendants also argue that their freedom of thought and right of privacy were violated by the trash searches. In brief, defendants argue that they have a right to have their private, unexpressed written "thoughts" protected from public observation. As stated previously, defendants lost any constitutional expectation of privacy in their seized trash items when the items were removed from the business or residence premises. Defendants motion to suppress items seized in the trash searches of their business and residence is denied.

### Telex Searches

In the trash pickups, customs agents found telexes transmitted between Gregg International and its customers. Telex is defined as "a communication system consisting of teletypewriters connected to a telephone network to send and receive signals." *The American Heritage Dictionary of the English Language*, 1324 (1981). George Byram, a former employee of Gregg International, told Customs Agent Garrison in an interview that the

business primarily communicated with its overseas business customers by telex. Garrison stated at the evidentiary hearing that a review of the telexes found in the trash indicated that they related to business of Gregg International and not personal matters of the Greggs.

On March 19, 1984, the government applied for authorization to intercept the telex communications of Gregg International. On March 19, 1984, Magistrate Calvin Hamilton authorized the telex interception for a thirty-day period, and the authorization was extended for additional thirty-day periods on April 30, 1984, May 24, 1984, and June 28, 1984. Customs agents obtained space in a building across the street from Gregg International and installed a printer which would print out all telex communications of Gregg International. The phone company installed an access line from the Greggs' communication line to the government printer. The printer gave agents two copies of each telex communication; Agent Garrison would seal one copy and work with the other copy. On June 10, 1984, the government moved their copier to the offices of RCA Global Communications in Overland Park, Kansas. RCA Global was the international communications link for the Greggs' telex messages. The printer remained at RCA Global until the interceptions ceased on June 30, 1984. The agents did not monitor the printer constantly, but checked the printer on a regular basis for any transmissions.

Defendants challenge the legality of the telex interceptions on several bases. First, defendants argue that the telex interceptions should have complied with the requirements of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* The government argues that Title III does not apply to telex interceptions, and the government contends it properly sought authorization for the telex interceptions pursuant to Fed. R.Crim.P. 41(b).

The applicability of Title III to interception of telex communications appears to be a question of first impression. Title III regulates the "interception of wire or oral communications." 18 U.S.C. §§ 2516(1), 2518(1). "Intercept" is defined as the *aural acquisition* of the *contents* of any wire or oral communication through the use of any electronic, mechanical, or other device. 18 U.S.C. § 2510(4) (emphasis added). Title III does not define "aural acquisition," but it has been stated that "an 'aural acquisition' by definition engages the sense of hearing." *Application of the United States for an Order Authorizing Installation & Use of a Pen Register,* 546 F.2d 243, 245 (8th Cir.1976), *cert. denied,* 434 U.S. 1008, 98 S.Ct. 716, 54 L.Ed.2d 750 (1978), *citing United States v. Falcone,* 505 F.2d 478, 482 (3rd Cir.1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975). "Contents" are defined to include "any information concerning the identity of the parties to such communication or the existence, substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

The applicability of Title III to the instant telex interceptions hinges on whether the interceptions involved the "aural acquisition" of the telex messages, since the "contents" of these wire communications clearly were obtained. "[T]he legislative history indicates neither what Congress meant by 'aural' nor why the word was written into the statute." *United States v. Seidlitz,* 589 F.2d 152, 157 n. 18 (4th Cir. 1978), *cert. denied,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 396 (1979).[2] In the absence of specific legislative guidance, the court must look to the most analogous communications interceptions and compare them with the method of telex interception.

In *United States v. New York Telephone Co.,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977), the Supreme Court held that

---

**2.** *Contra Hoosier Home Theater, Inc. v. Adkins,* 595 F.Supp. 389, 395–96 (S.D.Ind.1984) (The legislative history establishes that the intent of Title III "was to proscribe eavesdropping on 'oral conversations (otherwise) made in *private,* without the consent of any of the *parties* to such communications.' ") (emphasis in original).

Title III does not apply to telephone pen registers ·because the registers only decode electrical phone line impulses; the registers "do not hear sound" and therefore "do not accomplish the 'aural acquisition' of anything." *Id.* at 167, 98 S.Ct. at 369–70, 54 L.Ed.2d at 386. More importantly, the court further stated that the pen registers "present the information in a form to be interpreted by sight rather than hearing." *Id*, 98 S.Ct. at 370, 54 L.Ed.2d at 386.

In *United States v. Seidlitz, supra,* the United States Court of Appeals for the Fourth Circuit considered the applicability of Title III to interception of communication between two computer systems via telephone lines. In rejecting the applicability of Title III, the court stated:

> We find no merit in the defendant's suggestion that, in the absence of either a statutory definition of the word "aural" or of legislative history to indicate that Congress even considered the relationship of Title III to computer systems, we should ignore the plain meaning of the term "aural" and should hold that, regardless of whether a device detects sound, its ability to interpret the substance of a transmission brings it within the restrictions of the statute. Canons of statutory construction require that we attribute to legislatively undefined words their commonly accepted meaning and that we give effect to what must be presumed to have been the purposeful inclusion in the legislation of a qualifying term such as "aural" which restricts the statute's scope.

589 F.2d at 157 (footnotes omitted).

In *United States v. Torres*, 751 F.2d 875 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985), the court of appeals considered the applicability of Title III to television surveillance which involved visual transmissions without any audio interception. The court observed that "secretly televising people ... while they are in what they think is a private place is an even greater intrusion on privacy than secretly recording their conversations." *Id.* at 878. Nevertheless, the court found Title III inapplicable and stated that "a visual observation is in no possible sense an 'aural acquisition.'" *Id.* at 880.

The court finds that the telex interceptions did not involve the "aural acquisition" of defendants' communications; therefore, Title III is inapplicable to the interceptions. The interceptions at issue did involve acquisition of the telex analog "sounds" that were transmitted by wire; however, this interception simply is not the type of "aural acquisition" within the purview of Title III. If Congress had intended for Title III to encompass all communications in which the contents of the communications were intercepted, it would have said so. However, the court believes the term "aural acquisition" was added to limit Title III specifically to those interceptions that were "overheard," *i.e.*, involve the sense of actually hearing the conversation. If Congress views telex interceptions and other similar interceptions as posing the same privacy invasions as wiretaps, it should expressly bring them within the purview of Title III; the court will not ·do so 'through unsupported statutory construction. The printed telex messages intercepted by the government do not fall within the purview of Title III.[3]

■ Defendants further argue that the telex interceptions violated 47 U.S.C.

---

3. The court agrees with Judge Posner's observation in *United States v. Torres* that it is anomalous to have detailed statutory regulation of bugging and wiretapping but not of other intrusive interceptions such as video surveillance and the telex interceptions at issue. *See* 751 F.2d at 885. Nevertheless, the court concurs with Judge Posner's conclusion that

> [w]hen Congress has indicated the domain of a statute as clearly as it did when it enacted

Title III, we cannot apply the statute outside its domain merely because we are confident that if Congress had known then what we know now it would have used more general language. Congress said in language that could not be clearer that Title III is about the interception of wire and oral *communications* and that interception means *aural* acquisition.

*Id.* at 886 (emphasis in original).

§ 605.[4] The court finds, however, that section 605 is inapplicable in the present case. The statute is expressly limited to radio communications. Though some of defendants' telex communications were transmitted in part by satellite or microwave links, they are still considered wire communications by statute [5] and not radio communications, thus section 605 is inapplicable. *See United States v. Clegg,* 509 F.2d 605, 611–12 (5th Cir.1975).

■ Defendants further argue that the telex interceptions violated the Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. § 1801 *et seq.*[6] The government has

**4.** Section 605 provides:

Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received an intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is transmitted by any station for the use of the general public, which relates to ships, aircraft, vehicles, or persons in distress, or which is transmitted by an amateur radio station operator or by a citizens band radio operator.

**5.** 18 U.S.C. § 2510(1).

**6.** Section 1801 provides the following definitions:

(a) 'Foreign power' means—

(1) a foreign government or any component thereof, whether or not recognized by the United States;

(2) a faction of a foreign nation or nations, not substantially composed of United States persons;

(3) an entity that is openly acknowledged by a foreign government or governments to be directed and controlled by such foreign government or governments;

(4) a group engaged in international terrorism or activities in preparation therefor;

(5) a foreign-based political organization, not substantially composed of United States persons; or

(6) an entity that is directd and controlled by a foreign government or governments.

(b) 'Agent of a foreign power' means—

(1) any person other than a United States person, who—

(A) acts in the United States as an officer or employee of a foreign power, or as a member of a foreign power as defined in subsection (a)(4) of this section;

(B) acts for or on behalf of a foreign power which engaged in clandestine intelligence activities in the United States contrary to the interests of the United States, when the circumstances of such person's presence in the United States indicate that such person may engage in such activities in the United States, or when such person knowingly aids or abets any person in the conduct of such activities or knowingly conspires with any person to engage in such activities; or

(2) any person who—

(A) knowingly engages in clandestine intelligence gathering activities for or on behalf of a foreign power, which activities involve or may involve a violation of the criminal statutes of the United States;

(B) pursuant to the direction of an intelligence service or network of a foreign power, knowingly engages in any other clandestine intelligence activities for or on behalf of such foreign power, which activities involve or are about to involve a violation of the criminal statutes of the United States;

(C) knowingly engaged in sabotage or international terrorism, or activities that are in preparation therefor, or on behalf of a foreign power; or

(D) knowingly aids or abets any person in the conduct of activities described in subpara-

not suggested at any time, however, that defendants have acted as agents of a foreign power as defined in section 1801; furthermore, defendants have not shown that they come within the definition or that the government has attempted to bring them within this act. Therefore, the Foreign Intelligence Surveillance Act is inapplicable.

■ Finally, defendants argue that the telex interceptions did not meet the requirements of the fourth amendment or Fed.R.Crim.P. 41. In particular, defendants assert that electronic surveillance may not be authorized pursuant to Rule 41, that "intangible" property such as telex communications is not within the scope of Rule 41, that the telex warrants did not comply with the provisions of Rule 41(c), and that the warrants did not meet the probable cause requirements of the fourth amendment.

The court finds that the Magistrate properly authorized the telex interceptions pursuant to Rule 41(b). The rule authorizes the issuance of a warrant to:

> search for and seize any (1) property that constitutes evidence of the commission of a criminal offense; or (2) contraband, the fruits of crime, or things otherwise criminally possessed; or (3) property designed or intended for use or which is or has been used as the means of committing a criminal offense; or (4) person for whose arrest there is probable cause, or who is unlawfully restrained.

Rule 57(b), before its amendment in 1985, provided:

> If no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules or with any applicable statute.

The search authorization provided in these rules is undoubtedly broad enough to encompass the telex interceptions at issue. *Cf. United States v. New York Telephone Co.*, 434 U.S. at 168–70, 98 S.Ct. at 370–71, 54 L.Ed.2d at 387–88 (Rule 41 is sufficient-

ly flexible to include electronic intrusions authorized upon a finding of probable cause; *citing Katz v. United States,* 389 U.S. 347, 354–56, 88 S.Ct. 507, 512–14, 19 L.Ed.2d 576, 583–85 (1967)). The court finds that the warrants were properly issued pursuant to Rule 41(b) and complied in all respects with the requirements of Rule 41(c).

■ The court further finds that probable cause existed for the telex warrants to issue based on the supporting affidavits, and that the warrants meet the particularity requirements of the fourth amendment. Defendants failed to show at the evidentiary hearing that the supporting affidavits of Customs Agent Garrison contained deliberate falsehoods or reckless misstatements; the affidavits clearly provided probable cause for authorization of the telex searches. Furthermore, the affidavits were sufficiently particular to pass constitutional scrutiny. Defendants' most cogent argument regarding particularity is their assertion that the warrants' authorization of interception of *all* of defendants' business communications is improper, and that the intercepted communications should have been minimized as required for interceptions authorized under Title III. Defendants attempted to show at the evidentiary hearing that the telex machine could have been "programmed" to intercept only certain desired messages regarding designated business customers, thereby minimizing the required interceptions. The government argues that Gregg International was a business "permeated" with criminal activity, thus interception of all business-related telexes was proper.

While the telex warrants were indiscriminate in the respect that all communications were seized, the court does not believe that such a comprehensive seizure constitutes a *per se* fourth amendment violation. It can be conceded that the telex search at issue was less discriminating than a standard

graph (A), (B), or (C) or knowingly conspires with any person to engage in activities de-

scribed in subparagraph (A), (B), or (C).

physical search; however, the telex search is more discriminating than bugs or wiretaps which intercept all conversations, be they business or private. Evidence produced at the evidentiary hearing showed that the telex machine was used almost exclusively for business purposes and that probable cause existed to believe that the defendants' business was permeated with criminal activity. Given these circumstances, seizure of all telex communications by Gregg International is not so random or indiscriminate as to constitute a fourth amendment violation. Defendants' argument fails.

### Customs Searches

■ Defendants challenge three separate warrantless seizures by customs agents of items belonging to defendants.[7] The searches plainly were border searches which are not subject to the warrant provisions of the fourth amendment and are reasonable within the terms of the amendment. *See United States v. Ramsey*, 431 U.S. 606, 616–18, 97 S.Ct. 1972, 1978–79, 52 L.Ed.2d 617, 626–27 (1977). Defendants' cited authorities are distinguishable on the facts and law, and no further discussion is required.

### Statements of Werner Gregg

■ Defendants seek to suppress three statements taken by customs agents from defendant Werner Gregg. The first statement was taken by Special Agent Robert Tine on June 25, 1984, at the Los Angeles, California, airport. Evidence produced at the evidentiary hearing regarding this statement established that Agent Garrison in Kansas City contacted Agent Tine in Los Angeles and informed Tine that Gregg would be leaving for Tokyo, Japan, on a designated flight with unlicensed electronic equipment in his carry-on luggage. Agent Tine and other agents detained Gregg at the jetway entrance to the Tokyo flight. Agent Tine identified himself, asked Mr.

Gregg if he would agree to make a statement, and Mr. Gregg agreed. Gregg was taken to the customs office of the Los Angeles airport, where he gave a forty-five-minute statement to Agent Tine in the presence of other agents.

The second statement occurred on August 21, 1984, when Agents Garrison and Tine visited Werner Gregg at his business in Raytown, Missouri. Agent Tine indicated he wished to discuss the item seized at the Los Angeles airport and Gregg's petition to get the item back from the customs service. Gregg agreed to make a tape recorded statement in his office. The third statement at issue is an August 3, 1984, statement by Werner Gregg made in a phone conversation with an undercover customs agent in New York, New York. The focus of defendants' and the government's briefing and evidence has been on the first two statements.

Gregg was not placed under arrest at the time any of the statements were taken, nor was he given *Miranda* warnings at any time. Furthermore, Gregg was not informed that he was the subject of a customs investigation. Defendants allege that the statements at the Los Angeles airport were taken in a custodial setting and *Miranda* warnings should have been given. Defendants further argue that Gregg's statement at his Raytown business should be suppressed as "fruit of the poisonous tree"; *i.e.*, a result of the Los Angeles statement.

In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court stated:

[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and

---

7. On June 25, 1984, items were seized from Werner Gregg's luggage at the Los Angeles, California airport; on April 29, 1984, items were

seized in packages at the Chicago, Illinois airport; on August 24, 1984, an item was seized from a package at the Los Angeles airport.

custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Id.* at 300–02, 100 S.Ct. at 1689–90, 64 L.Ed.2d at 307–08 (footnotes omitted).

The statement taken from Werner Gregg at the Los Angeles airport was given freely and openly, and from the "totality of the circumstances" it is clear that Gregg was free to leave at any time and was not subject to coercive tactics which he could have perceived as custodial interrogation. The statement given by Gregg at his Raytown office also was given voluntarily and without any circumstances which could be construed as custodial interrogation. Regarding the third statement, defendants have not made any showing that the statement made to an undercover agent was made in a custodial setting. The *Miranda* safeguards did not come into play in any of the circumstances at issue, and suppression of the statements is not required.

---

**8.** The warrants provided that the following items could be seized:

documents that consist of sales, invoices, shipping papers, purchase orders, correspondence, payment records, and telexes relating to the purchase, sale, storage, transportation and financing of merchandise exported or to

*Search of Defendants' Business and Residence*

■ On September 13, 1984, pursuant to search warrants, customs agents and other law enforcement officials seized business records, telexes, and other documents from defendants' business, and documents and an automobile from defendants' residence. Defendants argue that probable cause did not exist for the issuance of the warrants, that the warrants did not particularly describe the items to be seized, that the language of the warrants was overbroad, that unauthorized persons participated in the searches, and that the searches were "general searches" not authorized by the warrants.

Extensive evidence was introduced at the evidentiary hearing regarding the search warrants themselves, the persons who conducted the searches, the manner in which the searches were conducted, and the items that were seized. A review of the affidavits submitted by Customs Agent Garrison in support of the search warrant applications reveals no deliberately false statements or reckless misstatements which would invalidate the warrants. The affidavits and supporting materials provided probable cause for the Magistrate to issue the search warrants.

The warrants described with sufficient particularity the items to be seized. The language of a warrant must be sufficiently definite to allow the searcher reasonably to ascertain and identify the items to be seized. *Steele v. United States*, 267 U.S. 498, 503–04, 45 S.Ct. 414, 416–17, 69 L.Ed. 757, 760–61 (1925). The warrant's description of the documents to be seized from defendants' residence and business was sufficiently definite for the searching agents to determine the items to be seized.[8] Furthermore, the language was not overbroad. The primary searchers were cus-

be exported from the United States in violation of the United States Export Administration Regulations, Parts 371, 372, 373, 386, 387 and Titles 22 USC 2778, 50 USC 1702, 50 USC 1705 and Presidential Executive Order 12470 of March 30, 1984.

toms agents who were informed regarding the documents to be seized and had adequate training to enable them to identify the described documents.

The search was not a general search. Thousands of documents were seized, but the seizure was not overbroad given the large quantity of documents generated by the business and the suspected breadth of the business's criminal activity. The search was conducted in an orderly manner with the intrusion minimized by the agents to the greatest extent possible. In addition, there is no evidence that unauthorized individuals or any individuals who were not law enforcement officers participated in the searches. The searches for and seizures of documents were conducted by trained government agents who were assisted by Raytown, Missouri police officers in maintaining order and removing documents during the search. Defendants' motion to suppress items seized from defendants' residence and business is denied.

### Statements of Roswitha Gregg

■ At the evidentiary hearing, defendants moved to suppress statements allegedly made by Roswitha Gregg during the search of the Greggs' business and residence. Customs Agent Thomas King testified that during the search of the Greggs' residence, and while inside the residence, Mrs. Gregg stated, "Why are you doing this when he is not here. Now they will think I made all the mistakes." King testified that Mrs. Gregg was not detained nor was she being interrogated when the statement was made, and he stated that Mrs. Gregg simply volunteered the statement without any prompting or response by the searchers. Customs Agent Curtis Fair testified that while Mrs. Gregg was at Gregg International during the initial stages of the business search, he overheard a statement made by Mrs. Gregg during a telephone conversation. Fair testified that Mrs. Gregg stated, "They are going to search the house. If they do they will find the old records that will hang him." Fair testified that Mrs. Gregg was not under

interrogation when the statement was made, and no questions were asked of Mrs. Gregg by agents after the statement.

As with the statements of Werner Gregg, the court finds from the totality of the circumstances that the statements of Roswitha Gregg were not made during custodial interrogation. *Miranda* warnings were not given to Mrs. Gregg, and she may have felt a personal compulsion to remain at the business and residence during the searches; however, it is clear that the statements were volunteered by Mrs. Gregg when she was not under any compulsion to remain in the search area. Most importantly, law enforcement officials in no way engaged in actions designed to elicit statements from Mrs. Gregg; her statements did not result from interrogation as defined in *Rhode Island v. Innis.* Defendants' motion to suppress these statements is denied.

For the reasons stated, it is

ORDERED that defendants' joint motion to suppress evidence is denied.