**UNITED STATES of America, Appellee,**

v.

**Werner Ernst GREGG and Roswitha Gregg, Appellants.**

**Nos. 86–1572/1787WM, 87–1622WM.**

United States Court of Appeals, Eighth Circuit.

Submitted June 8, 1987.

Decided Sept. 22, 1987.

Rehearing Denied Oct. 30, 1987.

---

John R. Osgood, Asst. U.S. Atty., Kansas City, Mo., for appellee.

James R. Hobbs and Thomas V. Bender of Linde, Thomson, Fairchild, Langworthy, Kohn & Van Dyke, P.C., Kansas City, Mo., for appellant, Werner Gregg.

James R. Wyrsch and Charles E. Atwell of Koenigsdorf, Kusnetzky & Wyrsch, Kansas City, Mo., for appellant, Roswitha L. Gregg.

Before WOLLMAN and MAGILL, Circuit Judges, and DUMBAULD,* Senior District Judge.

* The Honorable Edward Dumbauld, U.S. Senior District Judge of the Western District of Pennsylvania, sitting by designation.

DUMBAULD, Senior District Judge.

Appellants, Werner Ernst Gregg and his wife Roswitha Gregg, operated an export business known as Gregg International, handling avionics devices. Both defendants appeal from denial of their motion to suppress evidence.[1] Werner Gregg also alleges various trial errors. We affirm the judgments of conviction.

The curious feature of this case is that the customs agents investigating defendants' possible violation of export prohibitions first scrutinized trash collected from defendants' residence and place of business, and "found gold" in the form of discarded telex communications between defendants and customers. On the basis of these telexes the agents prepared affidavits which convinced Magistrate Calvin Hamilton that a search warrant should issue authorizing interception of current telex communications of Gregg International.[2] Details of the investigation are described in the opinion of the District Court[3] denying the motion to suppress. *U.S. v. Gregg*, 629 F.Supp. 958, 959–61 (W.D.Mo. W.D.1986). As a result of the telex materials, together with subsequent searches of the Greggs' residence and business, customs searches when Werner Gregg was personally attempting to carry merchandise out of the country, and statements taken from the defendants, an indictment containing thirteen counts[4] was returned against both defendants. Werner Gregg was convicted on Counts I–IV, and VII–IX, both inclusive and was sentenced, in the aggregate, to three years custody, followed by five years' probation, and a $200,000 fine. Roswitha Gregg was fined $4000 and three years confinement, suspended except for six months. A proviso ordered that husband and wife not be incarcerated simultaneously.

Defendants contend that all evidence seized from them should be suppressed, arguing that each subsequent seizure resulted as the poisonous fruit of prior illegal seizures, and hence that everything must be excluded.

■ However, as the District Court properly found, this "house that Jack built" argument collapses because the initial trash search was not illegal (629 F.Supp. at 960), citing *U.S. v. Michaels*, 726 F.2d 1307, 1312–13 (8th Cir.1984); and *U.S. v. Biondich*, 652 F.2d 743, 744–45 (8th Cir.1981). And in the case at bar as in *Biondich*, "Since we have concluded that the inspection of his garbage was lawful, the magistrate properly considered the items found in the trash when he made his determination that probable cause existed to justify the warrant", (652 F.2d at 745). Once the propriety of taking the results of the trash search into account is established, there is

1. Roswitha Gregg entered a conditional plea pursuant to Rule 11(a)(2) F.R.Cr.P. subject to resolution on appeal of the suppression issue. Roswitha Gregg's plea related to tax issues involved in Counts X and XI of the Indictment. Werner Gregg was acquitted on the tax counts (X through XIII). On motion of the United States Counts I through IX and XII and XIII were dismissed as to Roswitha Gregg.

2. Violations disclosed by the trash were too stale for effective prosecution. Testimony of case agent Ronald M. Garrison, Tr. I, 133.

3. The Honorable Joseph E. Stevens, Jr., District Judge for the Western District of Missouri.

4. Count I charged unlawful export of night vision goggles usable for military purposes, without a required license from the State Department; Count II, of sixteen military aircraft communication radios without State Department license; Count III, of component parts of a T.O.W. missile system without State Department license; Count IV, of a tactical air navigational radio system (often referred to during the case as a TACAN) without State Department license; Count V, of which Werner Gregg was acquitted, charged an attempt to export three radios without State Department license; Count VI, of which defendant Werner Gregg was acquitted, charged export of 31 millimeter wave guide components without validated Commerce Department license; Count VII charged attempt to export a Laser Inertial Navigation System for aircraft (often referred to during the case as a "Laser Nav") without a validated Commerce Department license [this unit was discovered in Werner Gregg's hand-carried luggage at the Los Angeles airport]; Count VIII charged false statement (gross undervaluation) of 25 transceivers; Count IX charged such undervaluation of 43 transceivers; Counts X–XIII were tax counts (understatement of income), as to which Werner Gregg was acquitted.

obviously substantial evidence justifying issuance of the warrant. We note also, as recognized in *Michaels* (726 F.2d at 1313–14), that under *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983), our scrutiny "of the sufficiency of an affidavit should not take the form of *de novo* review". A "substantial basis" for concluding that evidence of wrongdoing will be found is all that is required. As stated in *Massachusetts v. Upton*, 466 U.S. 727, 728, 104 S.Ct. 2085, 2085, 80 L.Ed.2d 721 (1984): "[T]he task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the Magistrate's decision to issue the warrant".

■ More interesting, and novel, is the Greggs' contention that interception of telex communication is subject to the requirements of Title III of the Omnibus Crime Control and Safe Streets Act of June 18, 1968, 82 Stat. 212, 18 U.S.C. §§ 2510 *et seq.* It is there enacted that

> "intercept" means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device. [18 U.S.C. § 2510(4)].

Evidence obtained by interception is to be excluded if disclosure of the information would be in violation of Title III. 18 U.S.C. § 2515. Procedure for obtaining court approval for interception is provided in 18 U.S.C. §§ 2516–19. Those procedures were not followed in the case at bar.[5]

We agree with the District Court's conclusion (629 F.Supp. at 962) that the printouts of telex communications do not constitute "aural" acquisition of the contents of the communications. Telex communication, unlike telephonic communication, does not involve hearing sounds of the voice. It is more like a pen register or television monitoring. Sight rather than hearing is the means of apprehending the contents.[6] Title III did not apply.[7] There is no merit in any of appellants' arguments in favor of suppressing the evidence.

Turning to the trial errors challenged by appellant Werner Gregg, we find no error in the District Court's rulings. It will be helpful first to set forth the unlawful acts involved in the counts of which defendant Werner Gregg was convicted by the jury.

Counts I–IV charged violations of section 38 of the Foreign Military Sales Act of October 22, 1968, 82 Stat. 1320, as added by Section 212(a)(1) of the International Security Assistance and Arms Export Control Act of 1976, 90 Stat. 729, 744–45, section 201(a) of which changed the name of the Foreign Military Sales Act to the Arms Export Control Act [90 Stat. 734], 22 U.S.C. § 2778, which provides in pertinent part:

> (a)(1) In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.[8]

> (b)(2) Except as otherwise specifically provided in regulations issued under sub-

---

5. Although the Government claims that a substantial equivalent of those procedures was observed in its practices.

6. Tom Hilleary, an electrical engineer, defendant's expert, testified that what is heard when a telex is in operation is obviously not speech, but a modulated audio signal. Tr. III, 464, 483. The witness knew of no commercially available equipment that would intercept only particular messages. Tr. III, 499.

7. In 1986 the definition was amended to read "aural or other acquisition." Appellee's brief, p. 15.

8. The actual list constitutes part 121 of Title 22, CFR. For items on the Munitions List the Department of State is the licensing authority. See 22 CFR subchapter M, part 120, 120.1, referring to Executive Order 11958, as amended (42 Fed. Register 4311).

section (a)(1) of this section, no defense articles or defense services designated by the President under subsection (a)(1) of this section may be exported or imported without a license for such export or import, issued in accordance with this chapter and regulations issued under this chapter....

(c) Any person who willfully violates any provision of this section or section 2779 of this title, or any rule or regulation issued under either section, or who willfully, in a registration or license application or required report, makes any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be fined not more than $100,000 or imprisoned not more than two years, or both.

It will be noted that allegations of willfulness are contained in every count under which Werner Gregg was convicted. It is also noteworthy that the prosecutors did not utilize the false representation provisions of 22 U.S.C. § 2778(c), but relied on 18 U.S.C. §§ 1001 and 1002.[9]

Count VII involved items for which a license from the Commerce Department was required, and alleged violation of section 11(b) of the Export Administration Act of 1979, 93 Stat. 503, 529, 50 U.S.C.App. § 2410, which provides:

(a) Except as provided in subsection (b) of this section, whoever knowingly violates or conspires to or attempts to violate any provision of this Act [sections 2401 to 2420 of this Appendix] or any regulation, order, or license issued thereunder shall be fined not more than five times the value of the exports involved or $50,000, whichever is greater, or imprisoned not more than 5 years, or both.

(b)(1) Whoever willfully violates or conspires to or attempts to violate any provision of this Act [sections 2401 to 2420 of this Appendix] or any regulation, order, or license issued thereunder, with knowledge that the exports involved will be used for the benefit of, or that the destination or intended destination of the goods or technology involved is, any controlled country or any country to which exports are controlled for foreign policy purposes—

\* \* \* \* \* \*

(B) in the case of an individual, shall be fined not more than $250,000, or imprisoned not more than 10 years, or both.

It will be noted that conviction under this statute requires proof of (1) willfulness; (2) violation of the Act or a regulation issued thereunder; (3) knowledge that the exports involved will be used for the benefit of, or that the destination or intended destination of the goods or technology involved is, any controlled country or any country to which exports are controlled for foreign policy purposes.

The Court's charge clearly covered these requisites:

The crime of attempted unlawful export of an item on the Commodity Control List as charged in Count VII of the indictment has two essential elements which are:

One: That the defendant intended to commit the crime of unlawful export of an item on the Commodity Control List; and

Two: That on or about June 25, 1984, the defendant intentionally carried out some act which was a substantial step towards the commission of the unlawful export of an item on the Commodity Control List.

To convict the defendant of an attempted unlawful export of an item on the Commodity Control List, the government must prove each of these essential elements beyond a reasonable doubt ...

To assist you in determining whether the defendant intended to commit the crime of unlawful export of an item on the Commodity Control List, as required by element one above, you are advised

---

9. Perhaps none of the documents Gregg was charged with falsifying in connection with the paperwork involved in the exportation process constituted a "required report."

that the elements of the offense alleged in Count VII are as follows:

First, that the defendant attempted to export the item alleged in the indictment;

Second, that the item was listed on the Department of Commerce Commodity Control List;

Third, that the defendant did so with knowledge that such item would be used for the benefit of a country to which exports are restricted for foreign policy purposes;

Fourth, that in so doing the defendant did not possess or have issued to him a validated license or other authorization for such export as required by law; and

Fifth, the defendant did such acts knowingly and willfully. [Instruction #39, Tr. (vol. X) 183–84]

Counts VIII and IX charged violations of 18 U.S.C. §§ 1001 and 1002.[10] Section 1001 of the Act of June 25, 1948, 62 Stat. 683, 749 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Appellant Werner Gregg strenuously contends that it was error not to admit as exhibits for consideration by the jury the Arms Export Control Act, the Export Administration Act, and the voluminous regulations thereunder. The argument is that they are relevant to the question whether specific intent was proved. Like questions of evidence generally, this was a matter for the trial court's discretion.

 Strictly speaking, this material would be irrelevant since the crucial issue is not whether the jury would be confused by these massive legislative and bureaucratic artifacts (or even whether the courts would be confused thereby) but *whether Werner Gregg was confused* by them. There was evidence that Gregg possessed considerable expertise on the subject. Indeed he gave lectures and published newsletters on the subject.[11] The trial court's charge admirably sifted out the portions of the statutes and regulations applicable to each count, and the pertinent references to the Munitions List and the Commodity Control List. The court's instructions likewise made it perfectly clear that the Government must prove beyond a reasonable doubt that the defendant acted knowingly and willfully, and with specific intent, and particular knowledge, as required by the respective counts involved.[12] Construction of the statutes and regulations so as to determine with precision what was required for conviction on a particular count was a matter of law for the court to decide. There was no harmful error in not cluttering the record unnecessarily with additional voluminous and complex exhibits, which

---

**10.** Section 1002, which obviously relates to falsified documents for the purpose of obtaining money from the government on false pretenses and has no applicability to circumstances such as those in the case at bar, reads:

Whoever, knowingly and with intent to defraud the United States, or any agency thereof, possesses any false, altered, forged, or counterfeited writing or document for the purpose of enabling another to obtain from the United States, or from any agency, officer or agent thereof, any sum of money, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**11.** Tr., VIII, 128, 140–41.

**12.** The charge is found in Tr. (vol. X) 158–207. After each numbered instruction, the page reference is given in parentheses. #5 (161) [must acquit unless Government proves beyond reasonable doubt that "the defendant has committed every element of an offense"]; #15 (166) [proof of specific intent required]; #16 (167) [intent may be proved from circumstances]; #18 (167) [defines "unlawfully"]; #19 (168) [defines "knowingly"]; #39 (183–84) [element of offense charged in Count VII is knowledge that such item would be used for the benefit of a country "to which exports are controlled for foreign policy purposes"]; #41 (186) [section 1485 A of Commodity Control List includes "inertial equipment", 15 CFR p. 511].

might indeed have distracted and unduly burdened or confused the jury.

Appellant also argues that the statutes and regulations are unconstitutionally vague. It is true that Congress enumerated various policies requiring conflicting factors to be weighed. Twenty points [13] are specified in sections 2 and 3 of the Export Administration Act of 1979.

Thus Congress declares that exports contribute to national well-being, but some exports might be detrimental to national security by contributing to the military potential of unfriendly countries. Hence export controls should be imposed to restrict such exports, but only to the extent necessary, or to prevent drain of scarce materials, or to discourage restrictions imposed by foreign countries, or to encourage other countries to act against terrorism. There may be ambiguities and vagueness in these policy objectives, but the task of weighing and balancing the conflicting factors is committed by Congress to Executive discretion. As explained clearly by Judge Zobel in *U.S. v. Moller-Butcher*, 560 F.Supp. 550, 552–553 (D.Mass.1983), Congress enumerated the factors which are to guide the discretion of the executive department, but "also clearly expressed its desire that the executive branch, not the courts, have the final word on which items should be restricted."

■ The policy factors specified by Congress are not elements of the criminal offense of unlawful export. When the case gets to court, all that the Government needs to prove is that the item exported appears on the Munitions List or the Commodity Control List, as the case may be (and, of course, that the defendant knowingly and willfully exported it, with the necessary intent and knowledge, and without an appropriate license).[14] There is no unconstitutional vagueness. It is as simple a matter as forbidding a passenger to ride on a train without a valid ticket.

■ As to Counts I, II, IV, appellant argues that export of the items covered by those counts was lawful under the "normal commercial use" exception in Category XII(c) of the Munitions List (22 CFR part 121). The asterisk indicates that the article is deemed to be "significant military equipment" for which "special export controls are warranted because of their capacity for substantial military utility or capability." 22 CFR 120.19(a) and 121.1(b). That category covers the following:

CATEGORY XII–FIRE CONTROL, RANGE FINDER, OPTICAL AND GUIDANCE AND CONTROL EQUIPMENT

* (a) Fire control systems; gun and missile tracking and guidance systems: [*sic*] military infrared, image intensifier and other night sighting and night viewing equipment; military masers and military lasers; gun laying equipment; range, position and height finders and spotting instruments; aiming devices (electronic, gyroscopic, optic, and acoustic); bomb sights, bombing computers, military television sighting and viewing units, inertial platforms, and periscopes for the articles of this section.

* (b) Inertial and other weapons or space vehicle guidance and control systems; spacecraft guidance, control and stabilization systems; astro compasses; and star trackers.

(c) Components, parts, accessories, attachments, and associated equipment specifically designed or modified for the articles in paragraphs (a) and (b) of this category, *except for such items as are in normal commercial use.* [Italics supplied] [15]

---

13. 93 Stat. 503–505. Codified with amendments in 50 U.S.C. App. 2401–2402, twenty-four points are listed.

14. The trial court's charge #30 (176) plainly directed acquittal if the jury was not satisfied beyond a reasonable doubt that the defendant knew that the items exported were on the Munitions List and required license. See #42 (187–88) for Count VII [Commodity Control List, 15 CFR part 399, and 370.3(a) and 387.3(a)].

15. It will be noted that 22 CFR 121.1, Category XII(a) includes "night viewing equipment" covered in Count I of the Indictment. Counts II and IV cover "electronic equipment ... for military application" listed in Category XI of the Munitions List. Count III (TOW missile) is a Category IV item.

Appellant contends that the items covered by Counts I, II, and IV were legitimated as items "in normal commercial use" or at least he could reasonably have thought so at the time of exportation.

This argument is unpersuasive. It will be noted that subparagraphs (a) and (b) carry the asterisk, meaning that the items listed therein are deemed to be "significant military equipment."

Subsection (c) clearly refers only to components, parts, accessories, attachments, and associated equipment designed or modified for use incidental to items in (a) or (b). Even though not deemed sufficiently significant to call for an asterisk, they are nonetheless considered as military items and subject to the export license requirement, unless they "are in normal commercial use." The exemption from a State Department license is limited, therefore, to *components* (not the principal device of which they form a part), and to components which are in *normal commercial use.* The "plain language" of the exception is so clear that any exporter claiming that the exception is applicable to the principal items covered by (a) or (b) does so at his peril.

Appellant likewise argues that it was error to exclude the opinion of a defense witness, James Rosenlieb, that the TACAN (tactical air navigation system) included in Count IV was not listed on the Munitions List (Tr., VIII, 192).

In explaining the reason for his opinion, the witness stated that if the equipment is used for its original purpose (air-to-air refueling) "there would probably be little doubt that it would be a ... State Department controlled item" (Tr., VIII, 195).[16] He went on to say that to the extent that the system is used "for ground application

of non-tactical, non-military nature" it would fall within the province of the Commerce Department. Inter-agency review would lead to allocation "depending on the end use" (Tr., VIII, 196).[17]

■ It seems clear that exclusion of this testimony was not harmful error. As set forth previously with regard to the policy issues referred to in *Moller-Butcher*, it is a matter of executive discretion to allow certain reliable consignees under Commerce Department authority to handle devices for non-military end-use. The testimony excluded would not have established any legitimate defense under the circumstances of the case at bar.

Appellant also contends that it was error to permit a demonstration to the jury of the manner in which a Tube Launched, Optically Tracked, Wire Command Missile System (T.O.W.) could be assembled from the components charged in Count III to have been exported by appellant, by combining with those components a launch tube and simulated warhead which appellant did not sell or export.

■ The thrust of this argument is similar to the objection often made in criminal cases that bullet holes in bloody clothing, or firearms and the like, are "inflammatory" and inadmissible. However, the contention is unconvincing where, as here, the demonstration and physical evidence are not pure "grandstanding" or dramatic sideshows, but logical explanations elucidating the nature and importance of the components which Gregg *did* export, and demonstrating their capability as part of what might be called a "going concern." One might quip that this is "synergistic" if not "syllogistic" proof.[18]

---

16. Rebecca Shoemaker, of Rockwell International, the manufacturer of the equipment, describes its function, and knew of no non-military use for it. The device gives bearing and distance by means of air-to-air transmission without need for a ground station. Tr. IV, 57–58. Bert I. Smith testified similarly that the use of the device is for refueling [Tr., IV, 159–60] and that Gregg asked him to alter documents by eliminating reference to air-to-air use [Tr., IV, 164].

17. See also Tr., I, 68 (ordinarily Commerce would yield to State).

18. The demonstration at least convincingly negated the "normal commercial use" argument. Appellant's brief (p. 30) does not press that argument in connection with Count III (citing Tr. VII, 14, which does not appear relevant to that point).

With respect to Count VII regarding attempted exportation of a "Laser Nav", appellant argues that there was not sufficient evidence to prove every element of the offense. As discussed previously, the statute requires, and the trial court's charge explicitly stated, that to convict under Count VII the jury must be satisfied beyond a reasonable doubt that, *inter alia,* appellant acted "with knowledge that the exports [would] be used for the benefit of, or that the destination or intended destination of the goods or technology involved [was] ... any country to which exports are controlled for foreign policy purposes."

■ What evidence does the record contain that appellant Gregg had such knowledge? The Government's brief (pp. 35–36) is not helpful in pointing to any.[19]

It would not be necessary to scrutinize the entire record (although we have done so) in order to conclude that there is plainly sufficient circumstantial evidence from which the jury might infer that Gregg knew that the destination of the Laser Nav was Japan, a country exports to which required a license.[20]

It will be remembered that the Laser Nav was the item part of which was found in Gregg's hand-carried luggage at the Los Angeles airport when he was about to board Singapore Airlines flight 11 for the

Tokyo international airport. Tr., V, 76.[21] The other portion of the Laser Nav had been checked through to Tokyo, Tr., I, 148–51. The fact that Gregg had two sets of paperwork in his possession for the shipment, stating different values, is also indicative of devious guilty knowledge. Tr., I, 151; V, 64–65; VII, 74–77. This inference is corroborated by the fact that Gregg concocted a fictitious "lease" in an effort to get back the seized equipment.[22] Tr., V, 34–35, 42, 62–65, 77, 93, 107; VI, 200; VII, 89. It is likewise significant that Honeywell jealously guards the Laser Nav against the possibility of "reverse engineering" and that Gregg resorted to subterfuge in procuring the device. Honeywell's sales agent was informed that it was to be used in an airplane owned by Jetex. Tr., IV, 176–81, 183–86; 207.

The contention that there was insufficient evidence to support a verdict of guilty cannot be accepted.

■ With respect to Counts VIII and IX, appellant urges that materiality was not adequately established. Appellant argues that undervaluation of the items being exported was a negligible or venial violation, since it was not an element in computing a tax or charge, to the pecuni-

---

**19.** The Government apparently regarded this issue as identical with that regarding vagueness, and as having been decided by *Moller-Butcher.* The Government seems to believe that the trial court should not have included knowledge of destination subject to export control as an element of the offense, and argues that since the instruction was in fact given there was no harm to appellant. The Government's position is unsound. The statutory language is specific in requiring such knowledge as an element of the offense. A verdict of guilty under a proper instruction requiring proof of a certain element of the offense does not supply or create, as if by automatic parthenogenesis, the necessary evidence to prove that element of the offense. Such evidence must be contained in the record.

**20.** Appellant's brief (pp. 40–41) acknowledges that exports to Japan "are restricted for foreign policy purposes," but goes on to argue that the Japanese are the "good guys" and that the articles involved would not jeopardize American national security (and should be stricken from the list because available from other sources).

This contention (unlike the Government's argument as to the need for evidence of knowledge of destination) does run afoul of the *Moller-Butcher* principle.

**21.** A travel agent testified regarding booking Gregg's itinerary from Los Angeles to Tokyo and beyond, and return. Tr. IV, 153–54.

**22.** Gregg had a general GTE license (General Temporary Export) which he contended would permit temporary export of the Laser Nav for a one year period. Tr., I, 63; V, 83–85. However, Gregg planned to leave for Japan on January 14, 1984. According to Terence Haglund, export manager for Honeywell, it was not until December 21, 1984, that a GTE license was first allowed to be used for temporary export of an inertial navigation system. Tr., IV, 192–93. Robert F. Tine, of the Customs Service, who stopped Gregg as he was getting on the airplane for Tokyo, testified that neither of the two sets of paperwork and licenses Gregg had in his possession would authorize export of the Laser Nav. Tr., V, 65, 106–107.

ary detriment of the Government.[23] However, the existence *vel non* of such a pecuniary loss to the Government is not the criterion for determining materiality. As pointed out in *U.S. v. Adler*, 623 F.2d 1287, 1291–92 (8th Cir.1980), a false document is material if it has a natural tendency to influence, or is capable of influencing, the official decision to evoke which defendant tenders it. That case also makes plain that in this Circuit the question of materiality is one of law. (623 F.2d at 1292).

Obviously the gross undervaluation in the case at bar was a stratagem designed to facilitate appellant's scheme to get the items out of the country. The record shows that the customs officials, in the press of business, are often guided by the declared values as indicia of the nature of the items being exported.[24] To use the quip of a recent ex-President, it is important whether they are dealing with "a Ford, not a Lincoln." The high value of an item may well indicate that it is sophisticated equipment, important for export control scrutiny by reason of its capability for military utilization.

Appellant seeks solace in Judge McMillian's footnote 8 (623 F.2d at 1292), in which Judges Bright and Ross did not join, that in his view "the better practice is to submit the materiality issue *in this kind of fraud case* to the Jury." The kind of fraud case involved in *Adler* was collecting from Medicare for services not actually performed by a physician. The issue was not so much the value of the services, but whether they had ever been furnished by the doctor. The circumstances relative to that type of determination might often present some questions of fact appropriate for resolution by a jury.

But the case at bar is not an example of "this kind of fraud case", for purposes of Judge McMillian's note. The *quantum* is the significant feature of the valuation for export control purposes. It is the figure which "lets the cat out of the bag" and tips off the customs officials to be alert in their scrutiny of the transaction.

Appellant's fictitious valuation certainly constitutes a "trick, scheme, or device" which "conceals or covers up" a material fact with respect to the nature of the articles being exported. In count VIII the discrepancy was between a declared value of $70,739.00 and a true value of $678,-188.80; in Count IX the difference was between a declared value of $116,616.00 and a true value of $1,226,160.00.

It would be extremely difficult to regard this falsification as *de minimis*.

Finally, appellant contends that there was error in receiving incoming telex communications without producing the author thereof for confrontation and cross-examination.

■ There are several grounds warranting the admission of these documents. In the first place, to the extent relevant, they are clearly admissible as business records under Rule 803(6) of the Federal Rules of Evidence (FRE).

The status of the telexes as records "kept in the course of a regularly conducted business activity" is not affected by the fact that particular telex printouts were obtained by the prosecution by search of trash cans, or by interception pursuant to court order, or by search pursuant to a search warrant.

In the second place, insofar as the particular telexes under attack may have been admitted provisionally, subject to later connection, as statements of a co-conspirator during the existence of a conspiracy and in furtherance thereof,[25] under Eighth Circuit law such evidence requires proof by independent evidence *aliunde* of the existence

---

**23.** It is of course true, as appellant stresses, that the valuation data form the basis of statistical compilations. Appellant's brief, p. 46; Tr., V, 150, 152.

**24.** See testimony of Daniel O. Hill, of the Commerce Department, Tr. I, 51–53, 58; of Paul

Tundo, Customs Inspector, Tr., V, 54–55; of Mark Eisenhauer, Customs Inspector, Tr. V, 119; of Harold Blyweiss, of the Commerce Department, Tr., V, 157.

**25.** Rule 801(d)(2)(E) FRE.

of the conspiracy and of the connection of the defendant and the declarant with it. *U.S. v. Bell,* 573 F.2d 1040, 1043–44 (8th Cir.1978); *U.S. v. Macklin,* 573 F.2d 1046, 1048 (8th Cir.1978); *U.S. v. Massa,* 740 F.2d 629, 637–38 (8th Cir.1984). *Bell* sets forth (573 F.2d at 1044) a procedure outside the hearing of the jury for an "explicit determination" regarding the admissibility of the statement. In the case at bar the *Bell* procedure was duly followed. Tr., IX, 175–76.

■ And finally, whether or not particular incoming telexes are treated as statements by coconspirators, we are satisfied that they are admissible as being merely integral portions of a reciprocal communication process in order to interpret and explain in a precise and intelligible fashion the meaning and significance of appellant's own statements or actions,[26] which are clearly admissible against him [27] as against his self-interest.

From the foregoing review of appellant Werner Gregg's assignments of error at trial, we are convinced that none of them require reversal. Hence, with respect to both appellants, the judgment of the District Court is

AFFIRMED.

---

**26.** For example, an incoming telex from a purchaser requesting hand-delivery of certain items might explain Gregg's actions at the airport if he were complying with such a request. Thus, the telex of December 23, 1983, to Gregg from Mr. Harrah of Kaigai-Bussan in Japan states: "Regarding Hughes products. We request you to carry items which will be delivered to you until the date you are leaving from Kansas [City] to Tokyo." Gregg replied the same day, "Please be advised that we received payment today 12–23–83. Will hand carry items per your request. Regards, Werner." Tr., VI, 66–67, 71–72. The incoming telex would serve to explain both Gregg's answer and his actions.

**27.** See Rule 801(d)(2)(A) FRE.