PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
         *Plaintiff-Appellee,*

v.

BING SUN; PATTE SUN; ALL PORTS,
INCORPORATED,
         *Defendants-Appellants.*

No. 01-4026

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(CR-00-28)

Argued: September 28, 2001

Decided: January 10, 2002

Before MICHAEL and MOTZ, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge Hamilton wrote the opinion, in which Judge Michael and Judge Motz joined.

## COUNSEL

**ARGUED:** Anthony Francis Troy, TROUTMAN, SANDERS, MAYS & VALENTINE, L.L.P., Richmond, Virginia, for Appellants. Alan Mark Salsbury, Assistant United States Attorney, Norfolk, Virginia, for Appellee. **ON BRIEF:** James C. Roberts, John S. West, TROUTMAN, SANDERS, MAYS & VALENTINE, L.L.P., Rich-

mond, Virginia, for Appellants Bing Sun and All Ports; Lawrence G. Cohen, David W. Lannetti, VANDEVENTER BLACK, L.L.P., Norfolk, Virginia, for Appellant Patte Sun. Kenneth E. Melson, United States Attorney, Norfolk, Virginia, for Appellee.

## OPINION

HAMILTON, Senior Circuit Judge:

Following a jury trial, Bing Sun and All Ports, Incorporated (All Ports) were convicted of conspiracy to export defense articles on the United States Munitions List (Munitions List) without a license and conspiracy to commit money laundering in violation of 18 U.S.C. § 371, 18 U.S.C. § 1956(a)(2)(A), and 22 U.S.C. § 2778. The jury also found Bing Sun, All Ports, and Patte Sun, Bing Sun's wife, guilty of two counts of attempting to export defense articles on the Munitions List without a license in violation of 22 U.S.C. § 2778. Bing Sun was sentenced to sixty months' imprisonment; Patte Sun to forty-one months' imprisonment; and All Ports to two years' probation and a $100,000 fine. The district court entered each defendant's judgment on December 28, 2000. Each defendant filed a timely appeal, and we now affirm.

I

A

The Arms Export Control Act (AECA), *id.*, authorizes the President to control, *inter alia*, the export and import of defense articles. *Id.* § 2778(a)(1). The Department of State, exercising this authority for the President, has promulgated the International Traffic in Arms Regulations (ITAR), 22 C.F.R. §§ 120.1-130.17. These regulations include the Munitions List, which consists of categories of military items that cannot be exported without a license issued by the Department of State's Office of Defense Trade Controls. 22 C.F.R. §§ 121.1, 123.1, 127.1. Because the United States maintains an arms embargo with the People's Republic of China, no license to ship items on the Munitions List to the People's Republic of China can be acquired. A

willful violation of the AECA or its implementing regulations subjects an offender to criminal sanctions. 22 U.S.C. § 2778(c).

B

When a United States military unit determines that a piece of military property, including an item on the Munitions List, is "obsolete," in a condition that is "no longer repairable," or in "excess," (J.A. 273), the military unit turns the property over to the Defense Reutilization and Marketing Service (DRMS), an agency operated by the Department of Defense. Once the military property is turned over to the DRMS, the DRMS offers it to other military units. If no other military unit is interested, the military property is offered to federal agencies, state agencies, and non-profit organizations. If there are no federal agencies, state agencies, or non-profit organizations interested in the military property, the military property is offered for sale, sometimes labeled as "scrap," to the general public through a national sales program. (J.A. 273). Often, multiple pieces of military property are offered for sale in "lots." (J.A. 276).

Through its national sales program, the DRMS issues Invitations for Bid to prospective purchasers. An Invitation for Bid contains a description of the items for sale, the terms and conditions of sale, a bid sheet, and an End Use Certificate.[1] The Invitation for Bid also indicates whether a particular lot contains items on the Munitions List. Importantly, even if a particular lot designates the military property as "scrap," the Invitation for Bid will indicate whether the lot contains items on the Munitions List.

Prospective purchasers of military property are also furnished with a Sale By Reference pamphlet, which states that items on the Munitions List which do not require demilitarization may be sold for "military or other use," (J.A. 1846), to those foreign countries to which the United States Department of State will issue an export license under the ITAR.[2] The Sale By Reference pamphlet also states that the use,

---

[1]The End Use Certificate must accompany each bid submitted by a prospective purchaser. The End Use Certificate indicates the purchaser's intended disposition of the property and the property's intended end use.

[2]All property in the government's military supply system is assigned a demilitarization code (Demil Code). Demil Codes vary depending on

disposition, export, and reexport of military property is subject to all applicable United States laws and regulations, the AECA, and the ITAR.

## C

Bing and Patte Sun were the primary owners of All Ports, a company headquartered in Fontana, California. The primary business of All Ports was the sale of United States government military property to the People's Republic of China. All Ports maintained warehouse facilities in Fontana, Norfolk, Virginia, and San Antonio, Texas.

The duties of operating All Ports were split between Bing and Patte Sun. Bing Sun inspected military property at various military facilities around the country. He prepared bid packages for submission to the DRMS. In addition, Bing Sun set up and oversaw the operation of All Ports' export facilities. Patte Sun, who was described as a knowledgeable businesswoman, administered the contracts that All Ports had with the DRMS, each one of which, according to the written Invitations for Bid, contained Munitions List items. All contract documents were delivered to All Ports' office in Fontana, where she worked. Patte Sun prepared the checks in payment of the contracts awarded to All Ports; assisted in the management of All Ports' warehouse in Fontana; and made shipping arrangements with overseas freight forwarders for the export of the military property.[3]

---

the nature of the item. For example, a chair has an A Demil Code, while a fully operational rocket launcher has a D Demil Code. An item of military property with a Demil Code B or later is an item on the Munitions List. The Demil Code determines how items are to be demilitarized. For an item of military property with a Demil Code of A or B, demilitarization is not required. However, all other Demil Codes require some form of demilitarization, which is performed, as a condition of the sale, by the DRMS or the purchaser.

[3]At trial, the government introduced evidence that Bing and Patte Sun, as knowledgeable businesspeople, were familiar with the AECA and its implementing regulations. The government also introduced evidence that Patte Sun told the owner of one of the overseas freight forwarders used by the defendants that All Ports does not "send any military scrap to foreign countries." (J.A. 495).

Between 1994 and 1999, All Ports shipped over 1,000 containers of military property to the People's Republic of China. During this period, approximately sixty-four End Use Certificates were submitted to the DRMS on behalf of All Ports as part of bid documents for lots of military property. Patte Sun completed and signed two of those End Use Certificates and the rest were completed and signed by Bing Sun. With one exception, these End Use Certificates indicated that the military property would be distributed in the "USA and other countries" and that the customers were "unknown at the present time."[4] (J.A. 1864). However, beginning in 1997, these lots of military property were shipped by All Ports to but one customer which had become All Ports' sole purchaser in the People's Republic of China.[5]

On May 7, 1999, without a license, the Suns and All Ports attempted to export, from Norfolk to the People's Republic of China, four shipping containers of military "scrap" property purchased from the DRMS.[6] These containers were presented for export at the Norfolk International Terminal, where they were detained and subsequently seized by the United States Customs Service. The material in three of these containers included items designated by the State Department as defense articles on the Munitions List, including fourteen twenty-millimeter tail-gun pods for the MK-4, nine twenty-millimeter nose pods for the MK-4, six underwater mines for the MK-60, two missile fins for air launched guided missiles, eight fin assemblies for air launched guided missiles, and thirteen twenty-millimeter gun pod center cylinders for the MK-4.

On May 13, 1999, without a license, the Suns and All Ports attempted to export, from Norfolk to the People's Republic of China, two shipping containers of military "scrap" property purchased from the DRMS. These containers were presented for export at the Norfolk International Terminal, where they were detained and subsequently

---

[4]Taiwan was identified on one End Use Certificate.

[5]As of May 1999, All Ports had become the customer with the largest number of active contracts with the DRMS, with a total value of its national sales contracts exceeding six million dollars.

[6]As noted earlier, even if an Invitation for Bid designates the military property as "scrap," the Invitation for Bid indicates whether the lot contains items on the Munitions List.

seized by the United States Customs Service. Items in these containers included wing assemblies for guided bombs, fin assemblies for air launched missiles, wing assemblies for air launched missiles, duct assemblies for the B-1 bomber, and missile fins for air launched guided missiles.

D

On February 24, 2000, Bing Sun, Patte Sun, and All Ports were charged in a forty-seven count indictment. Count One charged Bing Sun, Patte Sun, and All Ports with conspiracy to export defense articles on the Munitions List without a license and conspiracy to commit money laundering in violation of 18 U.S.C. § 371, 18 U.S.C. § 1956(a)(2)(A), and 22 U.S.C. § 2778. Counts Two through Twenty-Three charged the defendants with exportation of defense articles on the Munitions List without a license. 22 U.S.C. § 2778. Counts Twenty-Four and Twenty-Five charged the defendants with attempting to export defense articles on the Munitions List without a license.[7] *Id.* Counts Twenty-Six through Forty-Seven charged the defendants with money laundering. 18 U.S.C. § 1956(a)(2)(A).

Prior to trial, the government withdrew four counts of the indictment. Following a jury trial, with respect to Bing Sun and All Ports, the jury returned guilty verdicts on Counts One, Twenty-Four, and Twenty-Five. With respect to Patte Sun, the jury returned guilty verdicts on Counts Twenty-Four and Twenty-Five. The jury returned verdicts of not guilty on the remaining counts. Bing Sun was sentenced to sixty months' imprisonment; Patte Sun to forty-one months' imprisonment; and All Ports to two years' probation and a $100,000 fine. The district court entered each defendant's judgment on December 28, 2000. Each defendant filed a timely appeal.

II

The defendants contend that the AECA and its implementing regulations are constitutionally void for vagueness under the Due Process

---

[7]The defendants' attempts to export defense articles on the Munitions List without a license on May 7 and 13, 1999 formed the basis of Counts Twenty-Four and Twenty-Five.

Clause of the Fifth Amendment to the United States Constitution. We review a defendant's challenge to the constitutionality of a statute *de novo*. *United States v. Bostic*, 168 F.3d 718, 721 (4th Cir. 1999) (reviewing constitutionality of 18 U.S.C. § 922(g)(8)). The constitutionality of a regulation is also reviewed *de novo*. *United States v. Lee*, 183 F.3d 1029, 1031 (9th Cir. 1999) (reviewing constitutionality of the AECA and its implementing regulations), *cert. denied*, 528 U.S. 990 (1999), and *cert. denied*, 528 U.S. 1128 (2000).

"Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal, for 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" *Buckley v. Valeo*, 424 U.S. 1, 77 (1976) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)). Thus, "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

The defendants' challenge to the AECA and its implementing regulations is reviewed only as the AECA and the implementing regulations were applied to them. *Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998). "[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550 (1975). The Supreme Court has noted "that the approach to 'vagueness' governing a case like this is different from that followed in cases arising under the First Amendment. There we are concerned with the vagueness of the statute 'on its face' because such vagueness may in itself deter constitutionally protected and socially desirable conduct." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 36 (1963). Moreover, "where, as here, a criminal statute regulates economic activity, it generally 'is subject to a less strict vagueness test, because its subject matter is more often narrow and because businesses can be expected to consult relevant legislation in advance of action.'" *United States v. Iverson*, 162 F.3d 1015, 1021 (9th Cir. 1998) (quoting *United States v. Doremus*, 888 F.2d 630, 634 (9th Cir. 1989)). "[A] scienter requirement may mitigate a law's

vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Village of Hoffman Estates v. Flipside Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

We cannot say that the AECA or its implementing regulations are unconstitutionally vague as applied to the defendants. In fact, as applied to the defendants in this case, the statute is rather specific as to what conduct is prohibited: the export and/or the attempted export, without a license, of items on the Munitions List. As such, a person of ordinary intelligence, especially businesspeople as knowledgeable as Bing and Patte Sun, would understand what conduct is illegal. Similarly, law enforcement is not vested with the unrestrained power to arrest anyone exporting or attempting to export, without a license, items listed on the Munitions List. Rather, under the circumstances of this case, the police may only make an arrest under the AECA and its implementing regulations if an individual exports or attempts to export Munitions List items, without a license, with the requisite criminal intent. Not surprisingly, other courts have upheld the constitutionality of the AECA and its implementing regulations against vagueness challenges. *See, e.g.*, *Lee*, 183 F.3d at 1032-33 (holding that the AECA and its implementing regulations were aimed at a narrow group of persons which included the defendants and that in "the sensitive business of exporting military items, the statute and its implementing regulation more than suffice to put exporters on notice to consult the applicable regulations and, if necessary, contact the appropriate government agency to resolve any perceived ambiguity"); *United States v. Gregg*, 829 F.3d 1430, 1437 (8th Cir. 1987) (stating that the AECA "is as simple a matter as forbidding a passenger to ride on a train without a valid ticket" and rejecting the argument that the statute, which requires a knowing and willful export of Munitions List items, was unconstitutionally vague in violation of due process); *United States v. Swarovski*, 592 F.2d 131, 133 (2d Cir. 1979) (predecessor statute prohibiting export of Munitions List items was not unconstitutionally vague, as regulation was aimed at exporters and put them on notice of licensing requirements).

III

At trial, the main thrust of the Suns and All Ports' defense was that the material the defendants exported and/or attempted to export fell

within the so-called "scrap exemption" contained in a Commerce Department regulation, 15 C.F.R. § 770.2(g)(3). This regulation provides in relevant part as follows:

(g) Interpretation 7: Scrap arms, ammunition, and implements of war. Arms, ammunition, and implements of war, as defined in the U.S. Munitions List, and are under the jurisdiction of the U.S. Department of State, . . . except for the following, which are under the jurisdiction of the Department of Commerce . . . .

(3) Other commodities that may have been on the U.S. Munitions List are "scrap," and therefore under the jurisdiction of the Department of Commerce, if they have been rendered useless beyond the possibility of restoration to their original identity only by means of mangling, crushing, or cutting. When in doubt as to whether a commodity covered by the Munitions List has been rendered useless, exporters should consult the Office of Defense Trade Controls, . . . or the Exporter Counseling Division, . . . before reporting a shipment as metal scrap.

*Id.* Under the language of this Department of Commerce regulation, if an item which may have been on the Munitions List has been rendered useless beyond the possibility of restoration to its original identity by means of mangling, crushing, or cutting, the item is not subject to the export licensing requirements of the AECA and its implementing regulations.

Even though § 770.2(g)(3) is found nowhere in the AECA or its implementing regulations, the district court allowed the defendants to pursue their defense theory and instructed the jury as follows:

Now, ladies and gentlemen, there has been some reference to the Department of Commerce in this case and demilitarization in this case. Title 15, Part 770.2, Section (g)(3) of the Federal Code of Regulations states, in part, that "commodi-

ties that may have been on the United States munitions list are scrap and, therefore, under the jurisdiction of the Department of Commerce, if they have been rendered useless beyond the possibility of restoration to their original identity only by means of mangling, crushing or cutting."

This section means that if any item that may have been on the munitions list has been rendered useless beyond the possibility of restoration to its original identity by means of mangling, cutting, or crushing, it may be exported without a license or written authorization from the Department of State. If, on the other hand, that item that may have been on the munitions list has not been rendered useless beyond the possibility of restoration to its original identity by means of mangling, crushing, or cutting, it may not be exported without a license or a written authorization from the State Department.

The defendants contend that items which they purchased that may have been on the munitions list were rendered useless beyond the possibility of restoration to their original identity by means of mangling, crushing or cutting and, therefore, could be exported without a license or a written authorization from the State Department . . . .

If you find and accept as true the evidence in support of this contention and theory and believe the defendants' defense theory, and this defense leaves you with a reasonable doubt as to whether the government has proved beyond a reasonable doubt each and every element of the crimes charged . . . then you must find the defendants not guilty.

(J.A. 1490-91).

The defendants raise two arguments concerning § 770.2(g)(3), which regulation we will *assume for the sake of argument* applies in an AECA prosecution.[8] We shall address these arguments in turn.

---

[8]At oral argument, counsel for the government virtually conceded that § 770.2(g)(3) did not apply in a prosecution charging the exportation

First, the defendants contend that § 770.2(g)(3) is unconstitutionally vague as applied to them. This argument has no merit.

Like the AECA and its implementing regulations, § 770.2(g)(3) is rather specific as to when it applies. The plain language of the regulation states that items must "have been rendered useless beyond the possibility of restoration to their original identity only by means of mangling, crushing, or cutting." 15 C.F.R. § 770.2(g)(3). As such, a person of ordinary intelligence would understand what conduct is necessary to fall within the regulation: the item must be rendered useless beyond the possibility of restoration by mangling, crushing, or cutting the item.[9] Also, the regulation itself provides a means for exporters to verify their own compliance prior to shipping questionable items by consulting the State Department's Office of Defense Trade Controls or the Commerce Department's Office of Exporter Services. *Lee*, 183 F.3d at 1032 (noting that the AECA and its implementing regulations enable exporters to contact appropriate government agencies to resolve perceived ambiguities). Furthermore, as noted earlier, law enforcement is not vested with the unrestrained power to arrest anyone exporting or attempting to export without a license Munitions List items. Rather, under the circumstances of this case, the police may only make an arrest under the AECA and its implementing regulations if an individual exports or attempts to export Munitions List items with the requisite criminal intent and without a license.

Second, the defendants contend that the jury should have been instructed that the "scrap exception" was an element of their AECA

---

and/or the attempted exportation, without a license, of defense articles on the Munitions List. However, counsel for the government did acknowledge that the case was tried on the basis that § 770.2(g)(3) did apply in this case. Accordingly, we will assume without deciding that § 770.2(g)(3) applies in a prosecution charging the exportation and/or the attempted exportation, without a license, of defense articles on the Munitions List.

[9]The government presented evidence at trial demonstrating that the Munitions List items the defendants attempted to export were not rendered useless beyond the possibility of restoration by means of mangling, crushing, or cutting.

offenses, rather than an affirmative defense. According to the defendants, the burden was on the government to prove the inapplicability of § 770.2(g)(3). We disagree.

The district court's instruction is similar to the one upheld in *United States v. Durrani*, 835 F.2d 410 (2d Cir. 1987). In that case, the defendant was found guilty of exporting and attempting to export Munitions List items without a license in violation of the AECA. *Id.* at 413. In his defense, he relied on the official use and foreign assistance exceptions set forth in the AECA. *Id.* 419-22 (discussing 22 U.S.C. § 2778(b)(2)). The defendant claimed that these exceptions constituted elements of his AECA offenses and were not affirmative defenses. *Id.* at 417. After dismissing the foreign assistance exception for lack of any supporting evidence at trial, the *Durrani* court held that the official use exception was an affirmative defense. *Id.* at 420-21. In reaching this conclusion, the court "considered the text of the statute, its legislative history, the parties' relative abilities to present evidence on the issue and the structure of the statute generally." *Id.* at 420. Furthermore, the court rejected the defendant's argument that the jury instruction on the defense theory impermissibly shifted the burden of proof to the defendant. *Id.* at 423-24. The *Durrani* court noted that the district court had adequately instructed the jury on the burden of proof by charging that the government had the burden to prove the defendant's guilt by proof beyond a reasonable doubt and that the burden of proof remained on the government and never shifted to the defendant. *Id.*

Like *Durrani*, the "scrap exemption" theory advanced by the Suns and All Ports is an affirmative defense, not an element of a charge under the AECA. To be sure, if the official use exception, which is part of the AECA, is an affirmative defense to a charge under the AECA, then the "scrap exemption" must likewise be an affirmative defense. Furthermore, in this case, the district court correctly instructed the jury on the defendants' affirmative defense and cautioned the jury that the government had the burden to prove the defendants' guilt by proof beyond a reasonable doubt and that the government's burden of proof never shifted to the defendants.

IV

Patte Sun challenges the sufficiency of the evidence supporting her convictions for attempting to export defense articles on the Munitions

List without a license, 22 U.S.C. § 2778. Convictions on these counts required the government to prove that Patte Sun attempted to export defense articles on the Munitions List without having first obtained a license. *United States v. Reyes*, 270 F.3d 1158, 1169 (7th Cir. 2001).

A jury's verdict must be upheld on appeal if there is substantial evidence in the record to support it. *Glasser v. United States*, 315 U.S. 60, 80 (1942). In determining whether the evidence in the record is substantial, we view the evidence in the light most favorable to the government and inquire whether there is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt. *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (*en banc*). In evaluating the sufficiency of the evidence, we do not review the credibility of the witnesses and assume the jury resolved all contradictions in the testimony in favor of the government. *United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998).

The evidence in the record is more than sufficient to support Patte Sun's convictions for attempting to export defense articles on the Munitions List without a license. The evidence shows that Patte Sun was one of the primary operators of All Ports, which became a DRMS customer having the largest number of active contracts. She was familiar with DRMS sales procedures, and the evidence also shows that she was aware of export licensing requirements and falsely told the owner of one of the overseas freight forwarders used by the defendants that All Ports does not "send any military scrap to foreign countries." (J.A. 495). Patte Sun also signed two of the End Use Certificates which put exporters on notice of export licensing restrictions and listed the People's Republic of China as a prohibited country. All Ports also received a Sale by Reference pamphlet which spelled out the applicable federal laws governing the export of Munitions List items. Patte Sun also administered the contracts that All Ports had with the DRMS, each one of which, according to the written Invitations for Bid, contained Munitions List items. All contract documents were delivered to All Ports' office in Fontana, where she worked. In fact, she wrote the checks in payment for the DRMS contracts. Also, Patte Sun made most, if not all, of the shipping arrangements from the Norfolk International Terminal to the People's Republic of China. Finally, material in some of the containers which

the defendants attempted to ship on May 7 and 13, 1999 contained items on the Munitions List and there is no evidence to suggest that the defendants had the necessary license to make such shipments.

From the evidence described above, the jury was entitled to find beyond a reasonable doubt that Patte Sun knowingly and willfully attempted to export defense articles on the Munitions List without a license, 22 U.S.C. § 2778. Accordingly, Patte Sun's challenge to the sufficiency of the evidence must be rejected.[10]

V

Bing Sun argues that the district court erred when it enhanced his offense level by two levels for obstruction of justice. U.S. Sentencing Guidelines Manual (USSG) § 3C1.1. We disagree.

We review an application of the Sentencing Guidelines by the district court for clear error in factual matters; legal conclusions are reviewed *de novo*. *United States v. Wilson*, 198 F.3d 467, 471 (4th Cir. 1999), *cert. denied*, 529 U.S. 1076 (2000).

Section 3C1.1 of the Sentencing Guidelines directs a sentencing court to increase a defendant's offense level by two levels if the defendant "willfully obstructed or impeded . . . the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction." USSG § 3C1.1. If the defendant commits or suborns perjury, the obstruction of justice enhancement must be applied. *Id.* § 3C1.1, comment. (n.4(b)). For a sentencing court to apply the obstruction of justice enhancement based on perjury, the sentencing court, by a preponderance of the evidence, must find three elements: (1) the defendant gave false testimony, (2) concerning a material matter, (3) with the willful intent to deceive (rather than as a result of confusion, mistake, or faulty memory). *United States v. Smith*, 62 F.3d 641, 646 (4th Cir. 1995). We

---

[10]Patte Sun argues that the district court gave an erroneous aiding and abetting instruction to the jury. In addition, the defendants argue that the district court did not properly instruct the jury on the AECA's scienter requirement. We have reviewed these arguments concerning the district court's jury instructions and find them to be without merit.

noted in *Smith* that the obstruction of justice enhancement does not "automatically apply every time a defendant who testifies at trial is convicted." *Id.* at 647. "It may be that the defendant's specific statements on the stand were true, or were not intentionally false, or were not material." *Id.*

At trial, Bing Sun testified that he believed a license was not required because the military property being exported was merely military scrap. He further claimed that he relied on the advice of an attorney as well as an unidentified State Department official who purportedly told his daughter that an export license was not required for his shipments. Bing Sun also denied that the reason he had failed to list the People's Republic of China in any of the numerous End Use Certificates he completed was because he knew that, if he did so, All Ports would not have been awarded the contracts it sought from the DRMS.

The district court found that Bing Sun made numerous materially false statements with the willful intent to deceive the district court. The district court found that Bing Sun lied when, among other instances, he: (1) testified that he relied on the advice of counsel; (2) testified that he relied on the advice a State Department official had allegedly given his daughter; and (3) denied that the reason he had failed to list the People's Republic of China in any of the numerous End Use Certificates he completed was because he knew that, if he did so, All Ports would not have been awarded the contracts it sought from the DRMS. In the district court's view, "an attempt was made, looking at the entire record, to deceive the court about what he knew, when he knew it, and what his intent was with respect to these shipments." (J.A. 1563).

We cannot conclude that the district court erred when it found that Bing Sun committed perjury at trial. First, we cannot take issue with the district court's finding that Bing Sun testified falsely when he: (1) testified that he relied on the advice of counsel; (2) testified that he relied on the advice a State Department official had allegedly given his daughter; and (3) denied that the reason he had failed to list the People's Republic of China in any of the numerous End Use Certificates he completed was because he knew that, if he did so, All Ports would not have been awarded the contracts it sought from the DRMS.

Second, the materiality of Bing Sun's testimony is obvious. His testimony concerned the heart of the case, *i.e.*, whether he acted with the requisite criminal intent. Finally, we cannot take issue with the district court's finding that Bing Sun's testimony was given with the willful intent to deceive, as the district court was in the best position to judge Bing Sun's credibility. Accordingly, we reject Bing Sun's challenge to the district court's decision to increase his offense level by two levels for obstruction of justice.

## VI

For the reasons stated herein, the judgments of the district court are affirmed.

*AFFIRMED*